UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 07 B 14987 |
| | ) | Chapter 11 |
| SENTINEL MANAGEMENT GROUP, | ) | Judge John H. Squires |
| INC., | ) | |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the contested confirmation of an amended

plan submitted by Frederick J. Grede, the Chapter 11 Trustee (the "Trustee") for Sentinel

Management Group, Inc. ("Sentinel") and the Official Committee of Unsecured Creditors

(the "Committee") (the Committee together with the Trustee, collectively referred to as the

"Plan Proponents"). For the reasons set forth herein, the Court confirms the plan, as

amended and discussed herein, with an additional amendment and overrules the objections.

Namely, the Court directs the Plan Proponents to amend the "catch-up" provision in the plan

as discussed *infra*. The Plan Proponents are directed to file a Fourth Amended Plan within

seven days from the date of this Opinion, and shall file a proposed order of confirmation that

conforms with the appropriate Official Form pursuant to Federal Rule of Bankruptcy

Procedure 3020.

The Plan Proponents filed a Chapter 11 Plan of Liquidation on May 12, 2008 [Docket

No. 499] and related Disclosure Statement on May 13, 2008 [Docket No. 501]. A number

of creditors objected to the plan which led to the Plan Proponents filing an Amended Chapter

11 Plan of Liquidation on June 9, 2008 [Docket No. 571] and related Disclosure Statement

-2-

[Docket No. 573], which was followed by a further Modified Chapter 11 Plan of Liquidation [Docket No. 591] (the "First Amended Plan") and related Disclosure Statement [Docket No. 592] (the "Disclosure Statement") on June 18, 2008.

On June 19, 2008, the Court entered an order approving the Disclosure Statement as containing adequate information within the meaning of 11 U.S.C. § 1125(a) and approving the Plan Proponents' Joint Motion for Order Approving Solicitation and Voting Procedures and Setting Hearing on Confirmation of Liquidating Plan (the "Solicitation Procedures Order") [Docket No. 596]. The Solicitation Procedures Order, among other things, (i) set the dates, procedures, and forms applicable to the solicitation process, (ii) established tabulation procedures, (iii) established a deadline for objecting to the First Amended Plan and (iv) scheduled the hearing to consider confirmation of the First Amended Plan. The Solicitation Procedures Order set August 1, 2008 as the deadline for submitting a ballot and/or filing and serving objections to confirmation of the First Amended Plan.

The objections to confirmation were significant. Specifically, ten SEG 1 Customers (defined *infra*), collectively referred to as the Ad Hoc Committee of SEG 1 Customers[1] (the "Ad Hoc Committee") filed an objection to the First Amended Plan on August 1, 2008 [Docket No. 903]. The following creditors also filed objections to the First Amended Plan on August 1, 2008: (a) Lehman Brothers, Inc. ("Lehman") [Docket No. 939]; (b) Farr Financial, Inc. ("Farr Financial"), IPGL Ltd. ("IPGL"), Penson GHCO ("Penson"), and

---

[1] The Ad Hoc Committee holds in excess of $202 million in SEG 1 claims against Sentinel's estate. (Confirmation Hearing Trans. Aug. 13, 2008 at 144:14-18.) The members of the Ad Hoc Committee are FC Stone, LLC, Frontier Futures, Inc., Fortis Clearing Americas, LLC, Country Hedging, Inc., Alaron Trading Corporation, Cadent Financial Services, LLC, Rand Financial Services, Inc., Velocity Futures LP, Crossland Customer Segregated, and Peregrine Financial Group, Inc.

-3-

Penson Financial Futures, Inc. ("Penson Financial") [Docket No. 940]; (c) Citadel Equity Fund, Ltd. [Docket No. 942]; and (d) The Bank of New York Mellon[2] ("BNY") [Docket No. 943]. In response to the objections, the Plan Proponents filed a Memorandum in Support of Confirmation of the Amended Chapter 11 Plan of Liquidation [Docket No. 981].

A hearing was held on August 12, 2008 and August 13, 2008 to consider confirmation of the Amended Plan (the "Confirmation Hearing"). On August 25, 2008, pursuant to agreements reached with certain objecting parties, the Plan Proponents filed a Second Amended Chapter 11 Plan of Liquidation [Docket No. 1018]. The Plan Proponents also filed the Liquidation Trust Agreement on August 25, 2008 [Docket No. 1020].

On October 27, 2008, the Trustee filed a motion to approve, among other things, BNY's objection to the First Amended Plan [Docket No. 1151]. BNY's objection to the First Amended Plan was resolved on November 20, 2008 based upon a settlement entered into between the Trustee and BNY and approved by the Court (the "BNY Settlement") [Docket No. 1215]. On November 20, 2008, upon approval of the BNY Settlement, the Plan Proponents filed a Third Amended Chapter 11 Plan of Liquidation (the "Third Amended Plan" or "Plan"), which incorporates the amendments made in the Second Amended Plan, plus the agreements reached between the Trustee and BNY [Docket No. 1210].

Despite the settlement with BNY, many objections remain unresolved. Specifically, the Ad Hoc Committee, Penson, Penson Financial, Farr Financial, and IPGL (collectively

---

[2] Initially, this creditor was The Bank of New York. On July 1, 2008, The Bank of New York merged with Mellon Bank, N.A. to become The Bank of New York Mellon.

-4-

the "Plan Objectors") filed a joint post-Confirmation Hearing brief (the "Post-Confirmation Hearing Submission").[3]

Based upon the number of objections that remain unresolved in the Plan Objectors' Post-Confirmation Hearing Submission, the Court will address each objection by category in turn. Upon the testimony and evidence presented to the Court at the Confirmation Hearing, the Court makes the following findings of fact and conclusions of law.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Additionally, whether the Court should confirm the Third Amended Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## II. FACTS AND BACKGROUND

### A.    Sentinel and Its Customers

Sentinel was an Illinois corporation, headquartered in Northbrook, Illinois and was registered with the Securities and Exchange Commission as an Investment Adviser. Sentinel also was registered with the United States Commodity Futures Trading Commission

---

[3]   The Plan Objectors' arguments are directed to the Second Amended Plan. However, because the most recent filed plan incorporates the Second Amended Plan, their objections have not changed and are deemed directed equally to the Third Amended Plan. For the sake of organization, the Court will refer to the Third Amended Plan despite the fact that the Plan Objectors submitted their Post-Confirmation Hearing Submission prior to the filing of the Third Amended Plan.

-5-

("CFTC") as a futures commission merchant ("FCM").[4]  Sentinel's day-to-day operations

involved the management of cash investments for numerous clients, including commodity

brokers (which were registered FCMs), hedge funds, financial institutions, pension funds,

and individuals.  Generally, Sentinel was

> a privately held corporation, thinly capitalized, owned and
> operated by its founder, Philip Bloom, and his son, Eric
> Bloom, both of whom owned a significant percentage of its
> stock.  Its chief trader, Charles Mosley, and the Blooms
> controlled day-to-day operations of Sentinel including its
> website, accounting systems, investments, dealings with
> [BNY], customer statements and various financial
> arrangements.

*Grede v. McGladrey & Pullen LLP*, No. 08 C 2205, 2008 WL 4425447, at * 2 (N.D. Ill.

Sept. 26, 2008).

As a FCM, and an entity managing other FCM investments, Sentinel was required

to strictly segregate the investments of its customer groups from each other and from

Sentinel's own funds.  In fact, however, it did not segregate customer funds.  Rather,

Sentinel commingled customer funds with its own funds and used the customer funds as

collateral for its loans from BNY.  (Confirmation Hearing Trans. Aug. 12, 2008 at 35:1-

37:14.)

The principals of Sentinel divided its customers into four groups.  The first customer

group, known within Sentinel as SEG 1 (the "SEG 1 Customers"), was to consist solely of

the funds and property of customers of FCMs, which typically invested their customers'

---

[4] Generally, a FCM is a broker that trades futures contracts for customers who open
an account with the FCM and deposit cash or securities to serve as margin for the customers'
trades.  *See* 7 U.S.C. § 1a(20).  FCMs are required by the CFTC to keep their customers'
money segregated from funds they invest on their own behalf.  *See* 17 C.F.R. § 1.25.

-6-

funds through Sentinel. The second customer group, known as SEG 2 (the "SEG 2 Customers"), was to consist solely of the funds and property of customers of FCMs that were engaged in trading at foreign exchanges. The third group, known as SEG 3 (the "SEG 3 Customers"), was to consist of the funds and property of all other types of clients, including FCM house (non-customer) funds, as well as the funds and property of hedge funds, trust accounts, endowments, and individuals. The fourth customer group, known as SEG 4 (the "SEG 4 Customers"), was to consist of the funds and property of SEG 3 Customers whose property was denominated in Euros. In addition to managing investments for the SEG 1, SEG 2, SEG 3, and SEG 4 Customers' portfolios, Sentinel owned a "house" or "street" portfolio of securities which it traded for the benefit of Philip Bloom, Eric Bloom, and Charles Mosley, the officers, directors, and insiders of Sentinel.

### B.    Sentinel's Collapse and the Citadel Sale

On August 13, 2007, Eric Bloom, the president and chief executive officer of Sentinel, sent a letter to Sentinel's customers. The letter provided that Sentinel was halting redemptions out of a concern for the liquidity crisis in the credit markets. Sentinel was fearful that it would not be able to meet significant redemption requests without resorting to discount sales, which would cause unnecessary losses to its customers. This resulted in immediate demands for redemption by numerous customers.

On August 16, 2007, Sentinel entered into an agreement with Citadel Equity Fund, Ltd. and Citadel Limited Partnership (collectively "Citadel") whereby Sentinel agreed to sell, assign, and transfer to Citadel certain securities (the "Citadel Sale Securities") held for the benefit of SEG 1 Customers (the "Citadel Sale"). The final sale price paid by Citadel to

-7-

Sentinel was approximately $320.5 million (the "Citadel Proceeds"). (Disclosure Statement p. 14.) The Citadel Sale Securities were transferred to Citadel on August 16 and 17, 2007.

## C.    Sentinel's Bankruptcy Filing

Thereafter, on August 17, 2007, Sentinel filed a voluntary Chapter 11 bankruptcy petition. On August 21, 2007, Sentinel filed an emergency motion to appoint a Chapter 11 trustee [Docket No. 36]. On August 23, 2007, the Court granted Sentinel's motion for the appointment of a Chapter 11 Trustee [Docket No. 56]. On August 29, 2007, the Court approved the appointment of the Trustee as Chapter 11 trustee of Sentinel's estate by the United States Trustee [Docket No. 105]. On September 6, 2007, the United States Trustee appointed the Committee pursuant to 11 U.S.C. § 1102(a)(1) [Docket No. 156]. The Committee was initially comprised of five SEG 3 Customers and four SEG 1 Customers. Because one SEG 1 Customer resigned from the Committee, the Committee is now comprised of five SEG 3 Customers and three SEG 1 Customers.

## D.    The Citadel Distribution to SEG 1 Customers

On the petition date, Sentinel transferred $22,524,942 in cash to certain SEG 1 Customers from a SEG 1 account at Sentinel (the "August 17 Transfers"). (Disclosure Statement p. 14.) Three days later, on August 20, 2007, Sentinel filed an Emergency Motion for Approval of Turnover and Distribution of Certain Third Party Assets in order to compel the distribution of the Citadel Proceeds to the SEG 1 Customers [Docket No. 7]. BNY was holding the Citadel Proceeds pending an order of the Court. The Court held a hearing on the motion that same day. After considering the allegations of the motion and the arguments of counsel, the Court entered an order allowing BNY, in its discretion, to make the distribution of the Citadel Proceeds to the SEG 1 Customers, less a $15.6 million holdback amount

-8-

pending further order of the Court (the "Citadel Distribution Order") [Docket No. 18]. On

August 21, 2007, certain SEG 1 Customers (the "Citadel Beneficiary Customers") received

the BNY transfer of $297,050,808 (the "August 21 Transfers") (the August 17 Transfers and

August 21 Transfers, collectively referred to as the "August 2007 Transfers"). The August

2007 Transfers were made to a specific set of FCMs. Not all SEG 1 Customers or Class 3

claimants benefitted from these transfers. The Class 3 Customers who did not receive the

August 21 Transfers shall be known as the "NonCitadel Beneficiary Customers."

### E.    The Third Amended Plan

The Third Amended Plan, like the prior iterations, is a liquidating plan. It

incorporates a pro rata distribution scheme for all of Sentinel's customers. The principal

witness who testified in support of the Plan was the Trustee. The Court finds him both

knowledgeable and credible. The Plan provides for Sentinel's property to be liquidated and

for the proceeds of the liquidation and any recoveries obtained from litigation against third-

parties to be distributed to holders of allowed claims in accordance with the terms of the Plan

and the Bankruptcy Code. Further, the Plan provides that all of Sentinel's property will be

transferred to a liquidation trust for the liquidation, administration, and distribution of

Sentinel's property by a liquidation trustee (the Trustee). The liquidation trustee is

responsible for: (1) implementing and administering the Plan; and (2) initiating and

defending causes of action on behalf of the estate after the Plan is confirmed.

The Plan provides for distributions to creditors on the effective date or as soon

thereafter as practicable. Additionally, allowed claimants will receive distributions at

several intervals after the initial distributions. The essence of the Plan Proponents' efforts

is to treat Sentinel's customers equally, giving them pro rata treatment based on the amount

-9-

of their allowed claims. In this regard, the Third Amended Plan includes a proposed settlement to ensure that the SEG 1 Citadel Beneficiary Customers who received distributions from the proceeds of the Citadel Sale will not be entitled to receive distributions until the other customers who did not receive distributions from the Citadel Sale have achieved a similar percentage recovery, including interest from the dates of those distributions. (Confirmation Hearing Trans. Aug. 12, 2008 at 143:8-144:19.) In this regard, the Plan provides a provision in which the NonCitadel Beneficiary Customers can "catch-up" and receive treatment equal to the Citadel Beneficiary Customers. Further, the Plan provides the Citadel Beneficiary Customers the opportunity to settle and limit their potential exposure to avoidance or other claims in the event insufficient funds are recovered to permit all customers to achieve the same percentage recovery.

The Plan divides the creditors of Sentinel's estate into six classes. Class 1 of the Plan consists of priority claims other than administrative claims and priority tax claims. (Third Amended Plan § 2.3(a).) Class 2 of the Plan consists of secured claims. (*Id.* § 2.3(b).) Both Class 1 and 2 are unimpaired. (*Id.* § 2.3.) Holders of claims in Class 1 and 2 are deemed to have accepted the Plan under 11 U.S.C. § 1126(f). (*Id.*) Class 3 consists of customer claims and such claims are impaired. (*Id.* § 2.4(a).) Class 3 specifically includes the claims of SEG 1, SEG 2, SEG 3, and SEG 4 Customers. (Disclosure Statement p. 37.) Class 3 voted to accept the Plan pursuant to 11 U.S.C. § 1126. *See* Report of Balloting [Docket No. 979.] Class 4 consists of general unsecured claims. (Third Amended Plan § 2.4(b).) Holders of Class 4 claims are impaired and voted to accept the plan. *See* Report of Balloting. Class 5 consists of all claims, if any, held by insiders (defined by 11 U.S.C. § 101(31)), including Sentinel affiliates and persons who directly or indirectly hold an equity

-10-

interest in Sentinel. (Third Amended Plan § 2.4(c).)  The holders of Class 5 subordinated

claims are impaired and are deemed to have rejected the Plan.  (*Id.* § 2.4.)  Finally, Class 6

consists of all equity interests in Sentinel.  Holders of Class 6 equity interests are impaired

and are deemed to have rejected the Plan under 11 U.S.C. § 1126(g).  (*Id.* § 2.4.)

### III.  APPLICABLE STANDARDS

Section 1129 of the Bankruptcy Code sets forth the substantive requirements for

confirmation of a Chapter 11 plan.  In order to be confirmed, a plan must satisfy §

1129(a)(1)-(16).  *See In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997),

*rev'd on other grounds*, 526 U.S. 434 (1999).  A plan that satisfies every part of § 1129(a),

except for § 1129(a)(8), may be confirmed by "cram down" under § 1129(b) if the plan does

not discriminate unfairly between impaired classes and is fair and equitable to the rejecting

classes.  *Id.* at 961; *In re S. Beach Sec., Inc.*, 376 B.R. 881, 887 n.11 (Bankr. N.D. Ill. 2007);

*In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990).

The proponent of the plan bears the burden of establishing that each requirement set

forth in § 1129(a) has been met.  *In re Vita Corp.*, 358 B.R. 749, 750 (Bankr. C.D. Ill. 2007),

*aff'd*, 380 B.R. 525 (C.D. Ill. 2008).  The proponent has the burden of proving by a

preponderance of the evidence that the plan complies with those requirements.  *S. Beach

Sec.*, 376 B.R. at 887; *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005),

*aff'd*, No. 05 C 7075, 2008 WL 4379035 (N.D. Ill. Mar. 24, 2008); *Rusty Jones*, 110 B.R.

at 373.  Even absent the filing of an objection to a plan, the proponent must affirmatively

demonstrate that the plan is confirmable.  *Rusty Jones*, 110 B.R. at 373.  In addition,

regardless of whether an objection to confirmation has been asserted, the court must

-11-

determine whether the requirements of § 1129(a), and if applicable § 1129(b), have been

met. *Vita Corp.*, 358 B.R. at 750; *Rusty Jones*, 110 B.R. at 373.


## IV.  DISCUSSION

### A.    Section 1129(a) Objections to the Third Amended Plan

Section 1129(a)(1) mandates that "[t]he plan complies with the applicable provisions

of this title." 11 U.S.C. § 1129(a)(1).  The Code does not define the phrase "applicable

provisions," however, it is aimed at compliance with 11 U.S.C. §§ 1122 and 1123.  *In re S.*

*& W. Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984).  The legislative history for this

section states that "[p]aragraph (1) requires that the plan comply with the applicable

provisions of Chapter 11, such as section 1122 and 1123, governing classification and

contents of plan." H.R. REP. NO. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N.

6368; S. REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912.

> **1.    Whether the Third Amended Plan violates 11 U.S.C. §
> 1129(a)(1) because it improperly charges SEG 1
> Customers with implied interest on the Citadel
> distributions.**

The Plan Objectors argue that the Third Amended Plan violates 11 U.S.C. §

1129(a)(1)[5] because it charges all SEG 1 Customers with imputed interest on, among other

---

[5] The Plan Objectors cite 11 U.S.C. §§ 502(a) and 1123(b)(6) as the foundation for
this particular § 1129(a)(1) objection.  The Court is perplexed how the Plan Objectors can
assert these two sections of the Bankruptcy Code as the cornerstone for their objection yet
neglect to provide a single sentence of analysis or correlation to how the Plan violates these
provisions.  The Plan Objectors fail to develop their argument and their presentation of the
facts and law is not clear.  Because the Plan Objectors' argument is specifically focused on
§ 4.5(a) of the Plan, the Court attempts to analyze this portion of their Post-Confirmation
Hearing Submission as a general objection under § 1129(a)(1).

-12-

transfers, the approximate $297 million August 21 Transfers. In order to understand the

argument, the Court must dissect § 4.5(a) and the definition of "Percentage Recovery" in the

Third Amended Plan.

Section 4.5(a) of the Plan is simply known as a "catch up" provision and provides

that no distributions will be made to SEG 1 Customers unless and until:

> [A]ll Holders of Allowed Class 3 Customer Claims that are
> NonCitadel-Beneficiary Customers [i.e., SEG 3 Customers]
> shall have received a Percentage Recovery on account of such
> Claims equivalent to the Percentage Recovery of such Claims
> equivalent to the Percentage Recovery of such Citadel-
> Beneficiary Customer taking into account all of such Citadel-
> Beneficiary Customers' Class 3 Customer Claims.

(Third Amended Plan § 4.5(a).)[6]

This provision allows SEG 3 Customers to recover the percentage distribution equal

to that of the Citadel Beneficiary Customers who benefitted from the August 17 Transfers

and/or the August 21 Transfers. The Plan Proponents contend that the Third Amended Plan

was drafted to allow the NonCitadel Beneficiary Customers to realize a value equal to that

---

[6]  Instructive to understanding § 4.5 of the Plan, the Court notes that the Plan
Proponents' definition of "Percentage Recovery" is:

> shall mean the recovery on account of a Claim expressed as
> a percentage calculated by dividing (x) (i) distributions
> received under the Plan not including any distributions
> received on account of Tranche-P interests plus (ii) any other
> amounts distributed by the Debtor on account of a Class 3
> Customer Claim including the Citadel Sale Distributions plus
> Interest commencing on the date of such distributions, by (y)
> the Claim amount as calculated pursuant to Section 4.4 of the
> Plan.

(*Id.* § 1.1.)

-13-

of the SEG 1 Customers that are the Citadel Beneficiaries. The Trustee testified that, based on his forensic analysis of Sentinel's business dealings, all customers should be treated similarly and share pro rata in distributions from Sentinel's estate. (Confirmation Hearing Trans. Aug. 12, 2008 at 37:19-38:9; 48:9-20.) The difficulty with this, however, lies in the fact that $297 million and the August 17 Transfers were distributed to certain SEG 1 Customers at the beginning of this case. Thus, in order to accomplish the equality of treatment mandated by the Code, the Third Amended Plan calculates a "point of parity" at which it would be fair for Citadel Beneficiary Customers to share in further distributions with the other Class 3 claimants who, unlike the Citadel Beneficiary Customers, have received nothing so far. The Trustee testified that pursuant to this provision of the original and now the Third Amended Plan, Citadel Beneficiary Customers do not share in any distributions made under the Plan until NonCitadel Beneficiary Customers "catch up" to the amounts yielded by the Citadel Sale distributions plus interest calculated for the period commencing on the dates of such distributions. (*Id.* at 48:9-20.)

On its face, the "catch up" does not violate § 1129(a)(1). This section of the Plan is simply an effort to delay distribution to the SEG 1 Customers that received a post-petition transfer from the Debtor in relation to the August 21 Transfers. Assuming for the sake of argument, which the Court is not deciding, nor is it before the Court to decide at this juncture, that the August 21 Transfers were transfers of property of the estate, it would be appropriate to allow the Sentinel customers that did not benefit from either of the August 2007 Transfers to catch up and be treated equally as other similarly situated creditors in this case.

-14-

However, the definition of "Percentage Recovery" is troubling as it relates to "[i]nterest commencing on the date of such distributions [i.e., the August 17 Transfers or the August 21 Transfers]." (Third Amended Plan § 1.1.) Charging interest against the SEG 1 Customers who rejected the settlement encapsulated in the Third Amended Plan is appropriate. However, as the Third Amended Plan currently reads, the Plan Proponents charge the imputed interest against all the SEG 1 Customers, even those FCMs which did not receive a distribution as a part of the August 17 Transfers and/or the August 21 Transfers.

There is no basis under the Bankruptcy Code to charge interest for such a post-petition transfer from the date of distribution of the August 21 Transfers. However, it is well established in this district that a bankruptcy trustee can recover pre-judgment interest on an avoidable transfer from the earlier of (a) the date of the demand letter sent to the recipient of the avoidable transfer, or (b) the institution of an adversary proceeding to avoid the transfer. *See, e.g., Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 788-89 (Bankr. N.D. Ill. 2007); *Manning v. Wallace (In re First Fin. Assocs., Inc.)*, 371 B.R. 877, 921 (Bankr. N.D. Ind. 2007); *Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 574 (Bankr. N.D. Ill. 1997). This principle applies equally to actions to recover unauthorized post-petition transfers pursuant to § 549 of the Bankruptcy Code. *See Koonce v. McDonald (In re Koonce)*, 262 B.R. 850, 861 (Bankr. D.Nev. 2001); *Reiser v. Randolph County Bank (In re Masters)*, 137 B.R. 254, 262 (Bankr. S.D. Ohio 1992); *White v. Bradford (In re Tax Reduction Inst.)*, 138 B.R. 325, 325-26 (Bankr. D.D.C. 1991).[7]

---

[7] The Bankruptcy Code does not specifically allow, nor does it specifically prohibit,
(continued...)

-15-

After the Confirmation Hearing the Trustee filed a number of adversary proceedings

to avoid, among other things, the August 2007 Transfers (the "Adversary Proceedings").[8]

So, while initially there was no basis for imputing interest to any of the SEG 1 Customers

in the Third Amended Plan, if the Trustee succeeds in these Adversary Proceedings, there

now is a foundation for setting aside interest on the transfers received by the SEG 1

---

[7](...continued)
prejudgment interest on an award in an action to avoid a post-petition transfer under § 549.
However, it has been recognized that it is within the equitable discretion of the court to allow
pre-judgment interest at the rate set forth in 28 U.S.C. § 1961. *Moore v. Brewer (In re
HMH Motor Servs., Inc.)*, 259 B.R. 440, 453 (Bankr. S.D. Ga. 2000); *see also Wilson v. First
Nat'l Bank, Lubbock, Tex. (In re Missionary Baptist Found. of Am., Inc.)*, 69 B.R. 536, 537-
40 (Bankr. N.D. Tex. 1987).

[8] Adversary Proceeding No. 08-00743 *Frederick J. Grede, as Chapter 11 Trustee
for Sentinel Management Group, Inc. v. Fortis Clearing Americas, LLC*; Adversary
Proceeding No. 08-00744 *Frederick J. Grede, as Chapter 11 Trustee for Sentinel
Management Group, Inc. v. American National Trading Corp.*; Adversary Proceeding No.
08-00745 *Frederick J. Grede, as Chapter 11 Trustee for Sentinel Management Group, Inc.
v. Country Hedging, Inc.*; Adversary Proceeding No. 08-00747 *Frederick J. Grede, as
Chapter 11 Trustee for Sentinel Management Group, Inc. v. Crossland LLC*; Adversary
Proceeding No. 08-00749 *Frederick J. Grede, as Chapter 11 Trustee for Sentinel
Management Group, Inc. v. Farr Financial Inc.*; Adversary Proceeding No. 08-00750
*Frederick J. Grede, as Chapter 11 Trustee for Sentinel Management Group, Inc. v. Frontier
Futures, Inc.*; Adversary Proceeding No. 08-00751 *Frederick J. Grede, as Chapter 11
Trustee for Sentinel Management Group, Inc. v. IFX Markets, Inc., IPGL, Ltd. and Hain
Capital Holdings, Ltd.*; Adversary Proceeding No. 08-00752 *Frederick J. Grede, as Chapter
11 Trustee for Sentinel Management Group, Inc. v. Peregrine Financial Group, Inc.*;
Adversary Proceeding No. 08-00753 *Frederick J. Grede, as Chapter 11 Trustee for Sentinel
Management Group, Inc. v. Velocity Futures, LP*; Adversary Proceeding No. 08-00754
*Frederick J. Grede, as Chapter 11 Trustee for Sentinel Management Group, Inc. v. FC
Stone, LLC*; Adversary Proceeding No. 08-00755 *Frederick J. Grede, as Chapter 11 Trustee
for Sentinel Management Group, Inc. v. Penson Financial Futures, Inc. and Penson GHCO*;
Adversary Proceeding No. 08-00879 *Frederick J. Grede, as Chapter 11 Trustee for Sentinel
Management Group, Inc. v. Cadent Financial Services*; Adversary Proceeding No. 08-00880
*Frederick J. Grede, as Chapter 11 Trustee for Sentinel Management Group, Inc. v. Rand
Financial Services*; and Adversary Proceeding No. 08-00965 *Frederick J. Grede, as Chapter
11 Trustee for Sentinel Management Group, Inc. v. TradeMaven Clearing LLC*.

-16-

Customers who are defendants in those Adversary Proceedings. Because the Trustee apparently did not send any demand letters related to the August 2007 Transfers, or furnish any evidence that he had made such demands, interest may be set aside from the date that the Trustee filed the Adversary Proceedings. *See Phillips*, 379 B.R. at 789; *Schwinn Bicycle Co.*, 205 B.R. at 574; *see also Hankin v. Mersey Mold & Model Co. (In re Countryside Manor, Inc.)*, 239 B.R. 443, 447 (Bankr. D. Conn. 1999) (in the absence of evidence as to when the trustee made a demand on the defendant for recovery of an unauthorized postpetition transfer, the bankruptcy court regarded the date of the filing of the trustee's complaint as the date of demand, and exercised its discretion to award interest from that date).

Therefore, the Court finds that the Third Amended Plan improperly charges all SEG 1 Customers with interest, as defined in the Third Amended Plan, under the "catch up" provision. However, in light of the Adversary Proceedings, this problem has been remedied, in part. Rather than including interest in the "catch up" provision, the Plan Proponents may set aside or escrow interest on the August 17 Transfers and/or the August 21 Transfers from the date that the Adversary Proceedings were filed by the Trustee. The Trustee may recover the escrowed amount if he successfully recovers the August 2007 Transfers. Obviously, should the Trustee be unsuccessful in the Adversary Proceedings, such escrowed funds will be distributed to those defendants after a non-appealable final and judgment is entered in their favor.

-17-

2.  **Whether the Third Amended Plan violates 11 U.S.C. §§
    1122(a) and 1129(a)(1) and (a)(2) because the Plan: (a)
    combines SEG 1 Customers and SEG 3 Customers in
    Class 3; and (b) allows general unsecured creditors (Class
    4 claimants) to share in distributions of "Customer
    Property" with Class 3 claimants.**

The Plan Objectors argue that the Third Amended Plan violates § 1122(a) because

it impermissibly lumps the claims of the SEG 1 Customers with the dissimilar claims of the

SEG 3 Customers.  In addition, the Plan Objectors object to the Plan allowing the general

unsecured creditors (Class 4 claimants) to share in distributions of "Customer Property"[9]

with the Class 3 claimants.  For the following reasons, the Court rejects the Plan Objectors'

arguments and finds the Plan complies with § 1122(a).

a.  **Classifying SEG 1 and SEG 3 Customers in Class
    3 of the Third Amended Plan**

The Plan Objectors contend that the difference in these claims exists as a result of

the following: (1) the SEG 1 claims could be paid in full, depending on the outcome of the

Adversary Proceedings, before the claims of the SEG 3 Customers; (2) the SEG 1

Customers' relationship with Sentinel was governed by the requirements of the Commodity

Exchange Act ("CEA") and CFTC regulations, as well as the investment restrictions set forth

_____

[9]  The Third Amended Plan defines Customer Property to mean:

from and after the Petition Date, Cash, security, or other property, and
proceeds of such Cash, security, or property, received, acquired, or held by
or for, or which should have been held by or for, a Customer, including any
such property even if distributed to a Customer outside of the Plan and
subsequently recovered by the Estate, including all funds and securities on
deposit at the Bank of New York and in segregated accounts at JPMorgan
Chase & Co. in the name of Sentinel or the Chapter 11 Trustee.

(Third Amended Plan § 1.1.)

-18-

in Rule 1.25, which did not apply to the SEG 3 Customers; (3) the SEG 1 Customers' claims

consist of the funds owned by public customers and were invested in Sentinel on their behalf

by the SEG 1 Customers–SEG 1 Customers have no property or ownership interest in those

public funds; the SEG 3 Customers, on the other hand, may have "investors," but such

investors do not own the funds on deposit at Sentinel; and (4) the Plan is designed to sue

SEG 1 Customers who do not elect to accept the settlement, and embroils the SEG 1

Customers in litigation that does not apply to the SEG 3 Customers. The Plan Objectors

maintain that because of these significant disparities between the SEG 1 claims and the SEG

3 claims, such claims are not "substantially similar."

Section 1123(a)(1) of the Code requires that "a plan shall . . . designate, subject to

section 1122 of this title, classes of claims . . . and classes of interests[.]" 11 U.S.C. §

1123(a)(1).[10] Section 1122(a), in turn, provides as follows:

---

[10] Section 1123(a) provides in pertinent part as follows:

(a) Notwithstanding any otherwise applicable nonbankruptcy
law, a plan shall–
(1) designate, subject to section 1122 of this
title, classes of claims, other than claims of a
kind specified in section 507(a)(2), 507(a)(3),
507(a)(8) of this title, and classes of interests;
(2) specify any class of claims or interests that
is not impaired under the plan;
(3) specify the treatment of any class of
claims or interests that is impaired under the
plan;
(4) provide the same treatment for each claim
or interest of a particular class, unless the
holder of a particular claim or interest agrees
to a less favorable treatment of such particular
claim or interest[.]

(continued...)

-19-

> (a) Except as provided in subsection (b) of this section, a plan
> may place a claim or an interest in a particular class only if
> such claim or interest is substantially similar to the other
> claims or interests of such class.
> (b) A plan may designate a separate class of claims consisting
> only of every unsecured claim that is less than or reduced to
> an amount that the court approves as reasonable and
> necessary for administrative convenience.

11 U.S.C. § 1122.

"Every plan proponent creates its classification scheme with the goal of maximizing

the probability that its plan will be confirmed." *In re Bloomingdale Partners*, 170 B.R. 984,

996 (Bankr. N.D. Ill. 1994). A plan proponent has broad discretion in classifying claims.

*Id.* at 997. In other words, a debtor "possesses considerable, but not complete, discretion to

classify claims and interests in its Chapter 11 plan of reorganization." *In re Woodbrook*

*Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994). The improper classification of claims results in

denial of confirmation under § 1129(a)(1). *See S. & W. Enter.*, 37 B.R. at 158 (discussing

§ 1122(b) and the classification of unsecured claims).

Section 1122(a) "does not expressly require that all substantially similar claims be

placed in the same class, nor does it expressly prohibit substantially similar claims from

being classified separately." *In re SM 104 Ltd.*, 160 B.R. 202, 216 (Bankr. S.D. Fla. 1993).

Section 1122(a) permits classification of claims and interests subject to the restriction that

a claim or interest be included in a certain class only if it is "substantially similar" to other

claims and interests in that class. *See Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship*, 248 B.R.

668, 691 (D.Mass. 2000). Hence, pursuant to its express language, § 1122(a) requires only

---

[10](...continued)
11 U.S.C. § 1123(a)(1)-(4).

-20-

that dissimilar claims not be classified together. *See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 661 (6th Cir. 2002). The Code is silent on how to ascertain whether claims are "substantially similar," *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993); *Bloomingdale Partners*, 170 B.R. at 989. Indeed, § 1122 "provides little guidance as to how claims are to be classified." *In re Nat./Northway Ltd. P'ship*, 279 B.R. 17, 25 (Bankr. D.Mass. 2002).

The Seventh Circuit Court of Appeals addressed the classification of claims in the Chapter 11 context and stated as follows:

> A debtor in bankruptcy has considerable discretion to classify claims and interests in a chapter 11 reorganization plan. While a debtor may not separately classify claims solely in order to "gerrymander an affirmative vote on reorganization," claims may be classified separately if "significant disparities exist between the legal rights of the holder[s of the different claims] which render the two claims not substantially similar." Claims may also be separately classified if there are "good business reasons" to do so or if the claimants have sufficiently different interests in the plan.

*In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995) (*quoting Woodbrook*, 19 F.3d at 318). That being said, the court also noted that "[s]ome limits are necessary to offset a debtor's incentive to manipulate a classification scheme and ensure the affirmative vote of at least one impaired class. . . . " *Woodbrook*, 19 F.3d at 317. The Seventh Circuit has not defined those limits.

While many tests have been adopted by other courts, the Seventh Circuit has not endorsed a test. Rather, the Seventh Circuit has opined "that this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant

-21-

law. . . ." *In re Crawford*, 324 F.3d 539, 542 (7th Cir. 2003) (determining the legitimacy of

proposed classifications of claims in the Chapter 13 context). The *Crawford* case provides

guidance to the Court in the matter at bar. *See In re Quay Corp.*, 372 B.R. 378, 385 (Bankr.

N.D. Ill. 2007) ("Opinions construing classification under a plan proposed pursuant to

Chapter 13, § 1322(b)(1) may be seen to provide guidance in cases under § 1122(a) of

Chapter 11.").

The question then turns on how a court should determine whether claims are

"substantially similar." "Similarity is not a precise relationship, and the elements by which

we judge similarity or resemblance shift[] from time to time in bankruptcy." *Woodbrook*,

19 F.3d at 318. Lacking a specific test or definition from the Seventh Circuit, the Court

turns to other circuits. The Ninth Circuit postulated that the bankruptcy court must evaluate

"the nature of each claim, i.e., the kind, species, or character of each category of claims."

*Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994). This

determination should focus on the nature or legal attributes of the claims and not on the

status or circumstances of the claimants. *In re Coram Healthcare Corp.*, 315 B.R. 321, 349

(Bankr. D.Del. 2004); *see also In re Dow Corning Corp.*, 244 B.R. 634, 644 (Bankr. E.D.

Mich. 1999) (defining "substantially similar" as "similar in legal nature, character or

effect"), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000); *FGH Realty Credit Corp. v. Newark

Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 99 (D.N.J. 1993) ("The similarity of claims is

determined by their legal status in relation to the debtor."); *In re Frascella Enters., Inc.*, 360

B.R. 435, 442 (Bankr. E.D. Pa. 2007) ("The similarity of claims is not judged by comparing

creditor claims *inter se*. Rather, the question is whether the claims in a class have the same

or similar legal status in relation to the assets of the debtor.").

-22-

In other words, the emphasis is not upon the holder of the claim so much as it is upon what type of claim the holder has against the estate. *Coram Healthcare*, 315 B.R. at 349. "Section 1122(a) does not require 'absolute homogeneity' of all claims or interest[s]." *In re Simplot*, No. 06-00002-TLM, 2007 WL 2479664, at *14 (Bankr. D.Idaho Aug. 28, 2007). Moreover, claims are not required to be classified based on their value. *In re Resorts Int'l, Inc.*, 145 B.R. 412, 448 (Bankr. D.N.J. 1990).

The Court finds that the SEG 1 Customers' claims and the SEG 3 Customers' claims are "substantially similar," and the classification scheme set forth in the Third Amended Plan does not violate § 1122. The nature of the claims is similar. Indeed, both the SEG 1 and SEG 3 Customers hold unsecured claims against Sentinel's estate. Simply, the SEG 1 and SEG 3 claimants were customers of Sentinel. The fact that SEG 1 and SEG 3 Customers had different relationships with Sentinel with respect to investment restrictions and CEA and CFTC regulations fails to recognize that the nature of these claims is similar. The Trustee testified that all of the customer groups of Sentinel were subject to a regulatory scheme, and all of the customer assets were required to be segregated. (Confirmation Hearing Trans. Aug. 12, 2008 at 38:6-9.) According to the Trustee, Sentinel failed to segregate its customers' funds, and instead, immediately commingled the funds of different customer groups with Sentinel's house account. (*Id.* at 35:1-6.) In the Trustee's view, "all customer claims should be treated equally and should be in the same class." (*Id.* at 37:23-25.)

The Plan Objectors inappropriately focus on the claim holders themselves instead of the type of claims the holders have against Sentinel's estate. These claims are similar in their legal nature, character, and effect. The SEG 1 and SEG 3 claims are simply unsecured claims. Hence, these claims share common legal rights against Sentinel's assets.

-23-

The Plan Objectors cite to *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994) and contend that due to the fact that some of the SEG 1 Customers are involved in litigation with the Trustee, the SEG 1 claims and the SEG 3 claims are not "substantially similar" because some SEG 1 claimants may be paid in full prior to the claims of the SEG 3 Customers. The Court finds that *Johnston* is distinguishable from the situation at bar. There, the court found that the creditor was embroiled in litigation with the debtor regarding issues unrelated to the bankruptcy, that, if successful, would have fully paid the creditor's claim before all other unsecured creditors. *Id.* at 328. Further, the creditor's claim was potentially exceeded by the debtor's own claim against the creditor and subject to offset. *Id.* Finally, the creditor's claim was partially secured by a security interest in other property. *Id.* at 326. Therefore, the court concluded that the bankruptcy court did not clearly err in finding that the creditor held a different legal status from that of the other unsecured claimants. *Id.* at 328.

In this case, these special circumstances do not exist. First, the claims at issue here are all unsecured claims. None of the SEG 1 claims or the SEG 3 claims are secured by a security interest in other property of Sentinel. Second, while some of the SEG 1 Customers are involved in litigation with Sentinel in the Adversary Proceedings, that litigation is related to the bankruptcy case and is pending before this Court. The litigation focuses, in principal part, on the issue of whether the funds the Trustee seeks to distribute to Sentinel's creditors are property of the estate under 11 U.S.C. § 541. The outcome of the Adversary Proceedings will not have an affect on the priority of the Plan Objectors' claims. This is directly opposite to the creditor's claim at issue in the *Johnston* case. Finally, the SEG 1 and SEG 3 claims are not potentially exceeded by Sentinel's own claim against these creditors and subject to

-24-

set off. Thus, the Court finds the facts in *Johnston* distinguishable from the facts in the matter at bar. In sum, the Court finds that the SEG 1 and SEG 3 claims are "substantially similar," and the Plan's classification scheme does not violate § 1122.

        **b.**    **Allowing Class 3 and Class 4 claimants to share pro rata in the distribution of "Customer Property"**

Next, the Plan Objectors argue that the Third Amended Plan materially changes the entire classification and distribution structure of the Plan. Specifically, the Plan Objectors contend that the First Amended Plan provided that Customer Property would be distributed solely to Sentinel's customers in Class 3. The general unsecured creditors were placed in Class 4 and shared only in non-customer property *pari passu* with the deficiency claims of the customers in Class 3. According to the Plan Objectors, however, the Third Amended Plan contains the following material amendments: (1) the general unsecured creditors in Class 4 share in all assets of Sentinel's estate, including "Customer Property," *pari passu* with the customers in Class 3; and (2) the unsecured deficiency claims of customers from Class 4 are extinguished.

The Plan Objectors maintain that these amendments eliminate any distinction between Class 3 and Class 4 claims, thereby violating § 1122(a). In particular, the Plan Objectors argue that the Third Amended Plan places all customers and general unsecured creditors in one "super class" sharing in the same assets for distribution purposes. The Plan Objectors contend that the allowed general unsecured Class 4 creditors are not "substantially similar" to the regulated claims of the SEG 1 Customers or any other Class 3 claimants.

The Court rejects the Plan Objectors' argument that the Third Amended Plan eliminates any distinction between Class 3 and Class 4. The Third Amended Plan defines

-25-

Class 3 as "all Claims arising from Customer deposits with Sentinel (the 'Customer

Claims')." (Third Amended Plan § 4.4.) Class 4, on the other hand, consists of "all

unsecured Claims against Sentinel that do not constitute Administrative Claims, Priority Tax

Claims, Other Priority Claims, Customer Claims, or Subordinated Claims ('General

Unsecured Claims')." (*Id.* at § 4.5.) Clearly, the Plan Proponents designated separate

classes for customer claims and general unsecured claims. Indeed, the Plan Objectors admit

that Class 3 and Class 4, which are not substantially similar, are separate classes. Therefore,

the Court finds that the Plan Proponents have not violated § 1122(a) because the customer

claims and the general unsecured claims held by those who were not Sentinel's customers

are classified separately.

The real thrust behind the Plan Objectors' § 1122(a) objection relates to the treatment

and pro rata distribution that Class 3 and Class 4 receive under the Third Amended Plan.

According to the Plan Objectors, Class 3 and Class 4 are treated the same and share ratably

in the same assets, which, according to the objection, makes the separate classification

"spurious at best." This contention, however, does not truly relate to classification. Rather,

the argument addresses the treatment of these classes of claims, which will be discussed

*infra* in connection with the Plan Objectors' re-solicitation argument. The Court notes that

there is a distinction between the classification of claims, which has been addressed here,

and the distribution or treatment associated with a claim once it has been classified in

accordance with § 1122(a).

-26-

In conclusion, the Court finds that the Third Amended Plan does not violate §§ 1122(a) or 1129(a)(1). The claims of the SEG 1 and SEG 3 Customers are "substantially similar," and thus, properly classified. Further, the Court rejects the argument that the Plan eliminates any distinction between Class 3 and Class 4.

> **3.    Whether the Third Amended Plan incorporates material modifications to the First Amended Plan that require a new disclosure statement and re-solicitation of votes under 11 U.S.C. §§ 1127(c) and 1129(a)(2).**

Next, the Plan Objectors argue that the Third Amended Plan violates 11 U.S.C. § 1127(c) because the modifications thereto cannot be approved absent a new disclosure statement and re-solicitation of creditor votes.

Section 1127(a) of the Code provides, in relevant part, a "proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title." 11 U.S.C. § 1127(a). Section 1127(c) requires the proponent of a modification to comply with § 1125 with respect to the plan as modified. 11 U.S.C. § 1127(c). In other words, "proponents of plan modifications must comply with disclosure statement requirements with respect to the plan as modified." *In re Bloomingdale Partners*, 155 B.R. 961, 971 (Bankr. N.D. Ill. 1993). Further, § 1127(f) provides that §§ 1121 and 1129 apply with respect to any modification before confirmation under subsection (a), and states that for any modified plan to become the plan, there must be disclosure under § 1125 as the court may direct, notice and a hearing, and court approval of the modification. 11 U.S.C. § 1127(f). Because the Plan Proponents properly served the Third Amended Plan on all parties in interest, there is no dispute that the Plan Proponents have disclosed the nature of the modifications. The Court

-27-

turns its attention to whether the Plan Proponents need to re-solicit votes as a result of the modifications to the First Amended Plan.

The Plan Objectors argue that the Plan Proponents have re-written the entire distribution scheme with respect to Sentinel's Customers in the Third Amended Plan and it would be improper to confirm the Third Amended Plan without issuing a new disclosure statement and re-solicitation of creditor votes. Specifically, under the First Amended Plan, Sentinel's customers shared exclusively in the "Customer Property," and also shared *pari passu* with general unsecured creditors with respect to their deficiency claims. On the eve of the Confirmation Hearing, in order to settle certain disputes with at least one general unsecured claimant, the Plan Proponents amended § 4.5(a) of the Plan, to allow Class 4 general unsecured claimants to share equally with Class 3 claimants in the property of Sentinel's estate. The Plan Objectors contend that the Plan Proponents' Third Amended Plan improperly allows Class 4 general unsecured creditors to share in a pro rata distribution of the Customer Property.

Generally, "a creditor or stockholder who voted for or against a plan is deemed to have accepted or rejected the modifying proposal. But if the modification materially and adversely affects any of their interests, they must be afforded an opportunity to change their vote. . . ." S.REP. NO. 95-989, at 124 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5910. Bankruptcy Rule 3019 implements the plan modification codifications of § 1127 and provides:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed

-28-

> modification does not adversely change the treatment of the
> claim of any creditor or the interest of any equity security
> holder who has not accepted in writing the modification, it
> shall be deemed accepted by all creditors and equity security
> holders who have previously accepted the plan.

FED. R. BANKR. P. 3019.

In other words, a court may deem a claim or interest holder's vote for or against a plan as a corresponding vote with respect to a modified plan. *Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006); *see also* 11 U.S.C. § 1127(d). However, when a "modification materially and adversely affects any of [the voting parties'] interests, they must be afforded an opportunity to change their vote[.]" *In re Am. Solar King. Corp.*, 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988) (internal quotation omitted). While the law is clear in this regard, not all modifications require a debtor to re-solicit votes.

If modifications made to a plan prior to confirmation (but after the ballots have been counted) are minor, impact only a creditor who has been fully involved, and do not adversely impact any other creditor, then it is not necessary to solicit new acceptances. *In re Sherwood Square Assocs.*, 87 B.R. 388, 390 (Bankr. D.Md. 1988). Moreover, a new disclosure statement is not required in every instance where a modification is made; if the modification is minor, the existing disclosure statement will suffice. *In re Concrete Designers, Inc.*, 173 B.R. 354, 356 (Bankr. S.D. Ohio 1994). The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications. *In re Rhead*, 179 B.R. 169, 176 (Bankr. D.Ariz. 1995). The rules applicable to such modifications should be read and interpreted consistent to that end. *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984).

-29-

The analysis found in *American Solar King* echoes this sentiment. In *American Solar King*, the court held that Bankruptcy Rules 3018 and 3019 are "not to be enforced with blind routine [but] must instead be applied with an eye toward the fundamental principles of Chapter 11." *Am. Solar King*, 90 B.R. at 827. "As the Fifth Circuit recognizes, a mechanical reading of Rules 3018 and 3019 would inhibit" the give-and-take that occurs literally, on the courthouse steps, and "frustrate a fundamental objective of Chapter 11 to promote fully negotiated consensual plans." *Id.* at 825 n.33.

In essence, the issue before the Court is whether the modifications proposed by the Plan Proponents are material and adverse to Class 3 claimants. Finding *Collier on Bankruptcy* instructive on this point, *American Solar King* provided that "the severity of the modification need not be such as would motivate a claimant to *change* their vote–only that they would be apt to *reconsider* acceptance." *Id.* at 824. The modification proposed by the Plan Proponents combines Sentinel's Class 3 Customer claimants with its Class 4 general unsecured creditors as it concerns distribution of Sentinel's assets.

The Class 3 Customer claimants would have the right to reconsider their vote if the proposed modification would have a material impact on their respective share of the Customer Property, as defined in the Plan. The Disclosure Statement estimates that Class 3 consists of approximately $1.2 billion in claims. (Disclosure Statement p. 37.) While the general unsecured creditors in Class 4 roughly comprise $10 million in claims (*id.* at p.38), Class 3 claimants consist of approximately $739 million in SEG 3 Customer claims and

-30-

$427 million in SEG 1 Customer claims. (*Id.* at p. 37.) The Plan Proponents project a thirty-five percent distribution to the SEG 3 Customers or roughly $257.5 million will be distributed to the SEG 3 claimants.[11] (*Id.* at p. 7.)

Absent the Class 3 Customer deficiency claims, outlined in the Notice of Deficiency Class 4 General Unsecured Claims on Account of Class 3 Customer Claims [Docket No. 725], the general unsecured creditors in Class 4 hold roughly $10 million in unsecured claims against the estate. (*Id.* at p. 38.) The general unsecured claims will increase the distribution of Customer Property from $739 million in allowed Class 3 SEG 3 Customer claims to approximately $749 million. By allowing the general unsecured claimants to participate in the distribution of Customer Property, the SEG 3 Customers will receive approximately thirty-four cents for every dollar of their claim, or an approximate one cent reduction in the amount of their distribution under the Plan.[12] Therefore, the SEG 3

_____

[11] This amount does not include the August 2007 Transfers to the extent received by any Class 3 claimant.

[12] Prior to the amendment, SEG 3 claimants were projected to receive approximately a thirty-five cent distribution ($257.5 million ÷ $739 million = $0.348). By allowing the Class 4 general unsecured claims (absent the Class 3 deficiency claims) to share in the distribution of cash and cash proceeds of Sentinel's property, the amount of the claims increases by $10 million to $749 million. Therefore, the approximate amount available to distribute pro rata to the Class 3 claimants and Class 4 general unsecured claimants is roughly 34.3 cents ($257.5 million ÷ $749 million = $0.343).
    The Court notes that the Class 3 deficiency claims are included in Class 4 and share in this distribution. However, the Class 3 claimants own these deficiency claims. Their interests will not be negatively impacted by allowing their deficiency claims to share equally with their other Class 3 claims. Thus, the Court has excluded the deficiency claims in its analysis of the material impact of allowing Class 4 general unsecured claimants to share equally in the distributions under § 4.5(a.) of the Plan.

-31-

Customers will not suffer any meaningful or material dilution of their pro rata share as a result of the general unsecured creditors sharing in the approximate $257.5 million that is available to be distributed to these claimants on the effective date of the Plan.

The adverse impact flowing from the modification of allowing the general unsecured claimants to share pro rata with the Class 3 claimants in the Customer Property is a minuscule dilution of the amount that was to be distributed to Class 3 claimants under the First Amended Plan. The impact, while adverse, is not material, but is de minimus, and will not cause the Class 3 claimants to reconsider their vote. Therefore, the Third Amended Plan is "deemed accepted by all creditors . . . who have previously accepted" the First Amended Plan. FED. R. BANKR. P. 3019.

In conjunction with the § 1127(c) objection, the Plan Objectors claim the Plan violates § 1129(a)(2) for the same reasons. Section 1129(a)(2) requires that the plan comply with the applicable provisions of Title 11. The legislative history of this section indicates that Congress was concerned "that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure." H.R. REP. NO. 95-695, at 412 (1977), *reprinted in* 1978 U.S.S.C.A.N. 6368; S. REP. NO. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5912. Courts have focused on a plan proponent's compliance with the disclosure and solicitation requirements of §§ 1125 and 1126. *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 513 n.3 (5th Cir. 1998) (presuming that the district court utilized § 1129(a)(2) with respect to a § 1125 violation); *In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D. Mo. 1995) ("The principal purpose of section 1129(a)(2) . . . is to assure that the plan proponents have complied with the disclosure requirements of section 1125 . . . in connection with the

-32-

solicitation of acceptances of the plan."); *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 688 (Bankr. D.Colo. 1995) ("Section 1129(a)(2) generally requires the proponent of a plan to comply with applicable provisions of Title 11 in order to have its plan confirmed. These include § 1126 which governs acceptance of a plan and § 1125 which sets out the requirements for disclosure statements.") (Chapter 9 case). Additionally, § 1129(a)(2) mandates compliance with a court order issued in furtherance of the reorganization process. *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 236 (Bankr. D.N.J. 2000).

Some courts have strictly construed § 1129(a)(2), and denied confirmation for any violation of the Code. *Id.* at 236-37 (collecting cases). Other courts have taken a less draconian approach:

> Congress did not intend to fashion a minefield out of the provisions of the Bankruptcy Code. In fact, the legislative history mentions the provision only in passing, offering as an example of compliance that the debtor meet the disclosure requirements of § 1125 to satisfy § 1129(a)(2). Certainly, if Congress had meant that *any* infraction, no matter how early on in the case, no matter how minor the breach, and regardless of whether the court has remedied the violations, should result in a denial of confirmation, Congress would have given some clearer indication in the legislative history or made the statutory provision far more express.

*In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (citation omitted). "Nonetheless, 'serious violations of the Bankruptcy Code by a [proponent] can and should result in a denial of confirmation of a plan under § 1129(a)(2).'" *Greate Bay Hotel & Casino*, 251 B.R. at 237 (*quoting Landing Assocs.*, 157 B.R. at 810).

Because the Court found that the Third Amended Plan does not violate § 1127(c), it also finds that the Plan does not violate § 1129(a)(2).

-33-

**4.     Whether the Third Amended Plan violates 11 U.S.C. §§ 1123(a)(4) and 1129(a)(1) because the "settlement" proposed therein is coercive and leads to disparate treatment of members of the same class of claimants as a result of the Plan Objectors' rejection of the "settlement" by voting against the Plan.**

Next, the Plan Objectors claim that the Third Amended Plan violates 11 U.S.C. § 1123(a)(4) by withholding distribution of the SEG 3 and SEG 4 claims held by the Plan Objectors. Specifically, the Plan Objectors argue that the Plan violates § 1123(a)(4) because § 10.10(j) of the Third Amended Plan provides disparate treatment between: (1) the objecting and electing SEG 1 Customers;[13] and (2) the Plan Objectors' Class 3 claims and all other Class 3 claimants. Section 10.10(j) of the Plan provides:

> Notwithstanding anything to the contrary herein, Claims on account of SEG 2, SEG 3, or SEG 4 Customer accounts held by Citadel-Beneficiary Customers that are Electing Holders shall be treated under the Plan as if such Claims were held by NonCitadel-Beneficiary Customers only with respect to distributions as provided for in Section 4.5 of the Plan[.]

(Third Amended Plan § 10.10(j).)  In essence, § 10.10(j) of the Third Amended Plan prevents SEG 1 Customers, who do not enter into the settlement encapsulated within the Plan, from receiving distribution of their other claims against the estate.

In response to the Plan Objectors' concerns, the Plan Proponents amended the First Amended Plan to create a reserve for any distribution amounts that would be payable on the Plan Objectors' SEG 3 Claims (the "SEG 3 Reserve"). The Third Amended Plan provides in pertinent part:

---

[13]  The crux of this argument concerns whether the Citadel Beneficiary Customers received the Citadel Sale distribution. The Court addresses this contention in section IV.B.1 of the Opinion *infra*.

-34-

> With respect to each distribution that is made to Holders of
> Class 3 Claims, the Liquidation Trustee shall hold back and
> create a reserve equal to the distribution that Holders of
> Citadel Beneficiary Class 3 Customer Claims attributable to
> SEG 3 or SEG 4 accounts (the principal amount of such
> claims calculated consistent with Section 4.4 of this Plan)
> which voted against the Plan and/or lodged objections
> thereto, would have received had the portion of its Class 3
> Customer Claims attributable to a SEG 3 or SEG 4 account
> been Allowed and received a distribution.

(*Id.* § 7.20(a)(iii).) Despite the Plan Proponents' amendment to the Plan, the Plan Objectors

maintain their objection and believe the SEG 3 Reserve is insufficient to overcome the plain

reading of § 1123(a)(4).

To be confirmed, a plan must "provide the same treatment for each claim or interest

of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest[.]" 11 U.S.C. § 1123(a)(4). The text

of § 1123(a)(4) mandates that a confirmable plan provide the "same treatment" for class

members. The United States Supreme Court and the United States Court of Appeals for the

Seventh Circuit have consistently instructed lower courts to accord statutory terms or words

their ordinary, common meaning unless they are specifically defined by the statute or the

statutory context requires a different definition. *See, e.g., Walters v. Metro. Educ. Enters.,*

*Inc.,* 519 U.S. 202, 207 (1997); *Precision Industs., Inc. v. Qualitech Steel SBQ, LLC,* 327

F.3d 537, 544 (7th Cir. 2003). "[C]ourts must presume that a legislature says in a statute

what it means and means in a statute what it says there. When the words of a statute are

unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Conn. Nat'l*

*Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (internal quotations and citations omitted).

-35-

However, bankruptcy courts have some discretion in deciding whether class members are receiving the same treatment. Section 1123(a)(4) does not require precise equality, only approximate equality. *In re Dow Corning Corp.*, 255 B.R. 445, 497 (E.D. Mich. 2000), *aff'd in part and remanded in part*, 280 F.3d 648 (6th Cir. 2002) (*quoting Resorts Int'l*, 145 B.R. at 447 (Section 1123(a)(4) "is not to be interpreted as requiring precisely equality of treatment, but rather, some approximate measure [of equality].")). The "same treatment" does not mean "identical treatment" and other circuits have "approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate considerations." *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998) (*citing In re Drexel Burnham Lambert Group, Inc.*, 130 B.R. 910, 918-19 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992)).

The Court finds that § 10.10(j) of the Third Amended Plan does not violate § 1123(a)(4). While the Plan Objectors maintain their objection in light of the Plan Proponents' amendment and creation of the SEG 3 Reserve, they fail to address the Plan Proponents' reasoning for withholding payment of the Plan Objectors' SEG 3 Claims. The Plan Proponents point out that the basis for not distributing the Plan Objectors' SEG 3 Claims is found in the heart of 11 U.S.C. § 502(d).

Section 502(d) provides that "any claim of any entity from which property is recoverable under Section 550 or that is the transferee of a transfer avoidable under . . . 547, . . . 549" shall be disallowed until the transfer is returned to the estate. 11 U.S.C. § 502(d). In other words, an avoidance action operates as a bar to a claim until the preferential transfer is turned over. *Cent. Va. Cnty. Coll. v. Katz*, 546 U.S. 356, 371 (2006). The basic purpose

-36-

of § 502(d) is to ensure compliance with judicial orders. *In re Davis*, 889 F.2d 658, 661 (5th Cir. 1989). "The legislative history and policy behind section 502(d) illustrates that the section is intended to have the coercive effect of insuring compliance with judicial orders." *Id.* Section 502(d) functions as a defensive measure which precludes an entity that received a voidable or potentially voidable transfer from sharing in the distribution of the estate assets unless and until the transfer is returned to the estate. *In re Stoecker*, 143 B.R. 118, 131 (Bankr. N.D. Ill. 1992), *aff'd in part, rev'd in part on other grounds*, 143 B.R. 879 (N.D. Ill.), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir. 1993) ("Section 502 deals with the allowance of claims or interests, and permits a court to disallow any claim of the transferee which is (or was potentially) avoidable. . . .").

The Court finds that temporarily disallowing the Plan Objectors' Class 3 claims does not result in a discriminatory impact. Section 502(d) requires that "any claim" filed against the estate by an entity–that received a preferential or fraudulent transfer–shall not receive a distribution from the estate unless and until it repays such transfer to the estate. The Court notes that while § 502(d) is generally implemented in other circuits after a defendant is adjudicated liable, the Seventh Circuit is silent on this point. *See In re Odom Antennas, Inc.*, 340 F.3d 705, 708 (8th Cir. 2003) (*citing In re Davis*, 889 F.2d 658, 661-62 (5th Cir. 1989) (stating that § 502(d) should be used to disallow a claim after an entity is adjudicated liable)). Regardless, the Court finds that the creation of the SEG 3 Reserve and withholding payment of the Plan Objectors' Class 3 claims until the Adversary Proceedings are resolved does not violate § 1123(a)(4).

The creation of the SEG 3 Reserve by the Plan Proponents is simply a protective measure to ensure compliance with any order that may be entered by this Court in the

-37-

Adversary Proceedings. Delayed receipt of a distribution for this purpose does not result in discriminatory treatment. *New Power Co.*, 438 F.3d at 1122-23 (delayed receipt of distributions to members of a class whose claims remain disputed does not in and of itself violate § 1123(a)(4)). Moreover, the requirement of § 1123(a)(4) "that all claims or interests of the same class receive the same treatment does not appear to be violated by the escrowing of one class member's payments pending the outcome of disputes over the claim's validity." *Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810, 814 n.7 (6th Cir. 1990). Accordingly, this objection to the Third Amended Plan is hereby overruled.

> **5.    Whether the Plan Proponents violated 11 U.S.C. §§ 1129(a)(2) and 1129(a)(5) because the Third Amended Plan excludes non-electing SEG 1 Customers from the Liquidation Trust Committee and fails to appoint an institutional co-trustee.**

The Plan Objectors contend that the Third Amended Plan violates 11 U.S.C. §§ 1129(a)(2) and (a)(5) because the Plan excludes non-electing SEG 1 Customers from the "Liquidation Trust Committee," as defined in the Plan, and fails to appoint an institutional co-trustee. The thrust of this objection centers around § 1129(a)(5) which imposes as a requirement of confirmation (1) that there be disclosure of any individual proposed to serve, after confirmation, "as a director, officer, or voting trustee of the debtor," and (2) that the holding of such office by each individual "is consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1129(a)(5)(A).[14] The case law

---

[14] Section 1129(a)(5)(A) states in relevant part:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>      (5)(A)(i)    The proponent of the plan has

(continued...)

-38-

interpreting this section is sparse. *Am. Solar King*, 90 B.R. at 815 n.8.

Section 1129(a)(5)(A) comprises both disclosure and substantive requirements. *In re Beyond.com Corp.*, 289 B.R. 138, 144 (Bankr. N.D. Cal. 2003). First, the plan proponent must disclose the identity of an individual proposed to serve as director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan, or a successor to the debtor. *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999). The disclosure portion of this section has spawned most of the case law. One court has held that trustees of a post-confirmation trust established under 11 U.S.C. § 524(g) are not subject to § 1129(a)(5). *In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 267 (S.D. Ohio 1996). On the other hand, another court held that this section extends to members of the official committee of unsecured creditors who are charged under the plan with post-confirmation supervision of the debtor. *Beyond.com*, 289 B.R. at 145. Second, once disclosed, courts must evaluate under § 1129(a)(5)(A)(ii) whether the post-confirmation management serves the interests of creditors and equity security holders and is consistent

---

[14](...continued)

> disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan and
>
> > (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with comprise policy....

11 U.S.C. § 1129(a)(5)(A).

-39-

with public policy. *Id.*; *In re Sovereign Group, 1984-21 Ltd.*, 88 B.R. 325, 329 (Bankr. D.Colo. 1988).

The Third Amended Plan provides for the creation of a Liquidation Trust Committee. (Third Amended Plan § 6.16; Liquidation Trust Agreement § 3.1 *et seq.*) In the instant case, the Liquidation Trust Committee consults with the "Liquidation Trustee," as defined in the Third Amended Plan, regarding all material aspects of the continued operations of Sentinel's estate and all material activities of the Liquidation Trustee. (Third Amended Plan §§ 2.2 & 6.16; Liquidation Trust Agreement § 3.3.) In addition, the Liquidation Trustee must consult with, reach agreement, or obtain approval from the Liquidation Trust Committee with respect to several aspects of the operation of Sentinel's estate, including: (1) settlement of claims or causes of action (Liquidation Trust Agreement § 2.2(d)); (2) extending the statute of limitations with respect to certain actions (Liquidation Trust Agreement § 2.4(b)); (3) winding up affairs and paying certain professional fees (Liquidation Trust Agreement § 2.7); (4) retaining counsel and other professionals (Liquidation Trust Agreement § 2.10); (5) disallowing, in specific circumstances, inspection of the Liquidation Trust's books and records by a beneficiary of the trust (Liquidation Trust Agreement § 5.3); (6) making distributions after the initial distribution date (Liquidation Trust Agreement § 8.2); and (7) modifying and amending the Liquidation Trust Agreement regarding the value of assets transferred into the fund (Liquidation Trust Agreement § 9.4.). Further, the Liquidation Trust Committee has certain powers of its own, including the authority to initiate causes of action on behalf of the Liquidation Trust where the Liquidation Trustee has declined to pursue such action. (Third Amended Plan § 6.16(b); Liquidation Trust Agreement § 3.3(b).) If the Liquidation Trust Committee disagrees with any decision or exercise of power by the

-40-

Liquidation Trustee, the Court decides the issue at the request of the Liquidation Trust Committee. (*Id.*)

The composition of the proposed Liquidation Trust Committee includes three representatives from the Creditors' Committee: Discus Master Ltd.; Jump Trading, LLC; and Kottke Associates, LLC. (Third Amended Plan § 6.16.) In addition, JEM Commodity Relative Value Fund LP, Rotchford Baker, BC Capital Fund A LLC (collectively the "Ex Officio SEG 3 Members"), and Vision Financial Markets LLC (the "Ex Officio SEG 1 Member"), all members of the Creditors' Committee, are *ex officio* members of the proposed Liquidation Trust Committee with no voting rights. (*Id.*) Only one member of the extant Creditors' Committee, Penson, one of the Plan Objectors, is excluded from the Liquidation Trust Committee.

The Plan Objectors argue that the Third Amended Plan improperly excludes Penson from the Liquidation Trust Committee and fails to include any SEG 1 Customer who objected to the settlement encapsulated in the Plan as either a voting or *ex-officio* member of the Liquidation Trust Committee. According to the Plan Objectors, the failure to include representation for non-electing SEG 1 Customers is inconsistent with the interests of creditors and public policy under § 1129(a)(5)(A)(ii), and precludes confirmation of the Third Amended Plan. The crux of the argument is that the Liquidation Trust Committee is fundamentally unfair because non-electing SEG 1 Customers, who account for over seventy-one percent of all SEG 1 Customer claims, and more than twenty-seven percent of all Customer claims, are shut out from any representation or voice on the Liquidation Trust

-41-

Committee. Consequently, according to the Plan Objectors, the Liquidation Trustee and the Liquidation Trust Committee will be able to proceed without consulting or informing the non-electing SEG 1 Customers of their proposed actions and decisions.

Furthermore, the Plan Objectors point to the Disclosure Statement, which articulates that Penson was excluded from the Liquidation Trust Committee because it did not support the Third Amended Plan. (Disclosure Statement p. 42.) The Plan Objectors allege that excluding Penson from the Liquidation Trust Committee "appears to be nothing more than a vindictive maneuver to punish Penson" for its unwillingness to agree to all provisions of the Third Amended Plan. (Post-Confirmation Hearing Submission p. 19.) The Court rejects this contention. The Plan Objectors failed to present any evidence in support of this argument. This cursory argument fails to contain any meaningful legal discussion, and is therefore waived. *See Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir. 2005).

The Plan Proponents, on the other hand, contend that the constitution of the Liquidation Trust Committee was the subject of extensive negotiations and is representative of Sentinel's customers. Moreover, according to the Plan Proponents, Penson's concern about its lack of a SEG 1 voice on the Liquidation Trust Committee has been alleviated because Vision Financial Markets LLC, a SEG 1 Customer, has been added to the Liquidation Trust Committee as an *ex officio* SEG 1 member.

The Plan Objectors do not dispute that the Liquidation Trust Agreement identifies Frederick J. Grede, the Trustee, as the Liquidation Trustee. The Third Amended Plan proposes that on the effective date, all property of Sentinel shall be transferred to the

-42-

Liquidation Trust. (Third Amended Plan § 6.4.) Sentinel would cease to exist, and all management responsibility would transfer to the Liquidation Trustee. (Id. § 6.5.)

After considering the parties' arguments, the Court finds that § 1129(a)(5)(A)(i) does not apply to the Third Amended Plan. The Court notes that in the over five pages that the Plan Objectors devote to this particular argument, they do not cite a single case in support of their position that the exclusion of Penson from the Liquidation Trust Committee violates § 1129(a)(5). Neither the Liquidation Trustee nor the Liquidation Trust Committee constitutes an individual who would serve as a director, officer, or voting trustee of Sentinel. Further, there is no affiliate of Sentinel participating in a joint plan with Sentinel, nor is there a successor to Sentinel under the Third Amended Plan. *See, e.g., Am. Solar King,* 90 B.R. at 815 ("The subsection does not (and cannot) compel the debtor to do the impossible. . . . If there is no proposed slate of directors . . . there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).") Even if this section did apply, the Court finds that the Plan Proponents have adequately disclosed the identity of the Liquidation Trustee as well as all the members of the Liquidation Trust Committee.

Because § 1129(a)(5)(A)(i) does not apply to the Third Amended Plan at bar, § 1129(a)(5)(A)(ii) equally does not apply. The language of subsection (a)(5)(A)(ii) refers to "the appointment to . . . such office of such individual . . . ," which pertains to an individual proposing to serve as a director, officer or voting trustee of the debtor. As the Court noted *supra,* the Chapter 11 Trustee, who is the Liquidating Trustee, is not an individual who would serve as a director, officer, or voting trustee of Sentinel post-confirmation. Sentinel will cease to exist post-confirmation.

-43-

Nevertheless, assuming *arguendo* that § 1129(a)(5)(A)(ii) applies here, the Court finds, based on the record, that the Liquidation Trustee and the Liquidation Trust Committee serve the interests of all Sentinel's creditors. Additionally, the appointment of the Liquidation Trustee and the creation of the Liquidation Trust Committee are consistent with public policy and § 1129(a)(5).

The Plan Objectors failed to show that the Liquidation Trustee and the Liquidation Trust Committee are not consistent with the interests of creditors and public policy. The Plan Objectors maintain that Sentinel's customers have been split into two groups: SEG 1 Customers and SEG 3 Customers. According to the Plan Objectors, the Creditors' Committee was comprised mainly of SEG 3 Customers, and those Customers were able to control the voting on the Creditors' Committee. The Plan Objectors maintain that the Third Amended Plan was drafted by SEG 3 Customers and it generally benefits their interests. The Court rejects the argument that the Plan was drafted by SEG 3 Customers and benefits their interests. The Plan Objectors failed to proffer any evidence to demonstrate this point. The Trustee testified that the negotiations that led to the Plan were "at arm's length" and "were fair and reasonable." (Confirmation Hearing Trans. Aug. 12, 2008 at 47:18-48:1.) More importantly, the Trustee, when asked whether he accepted what the SEG 3 Customers proposed as their plan, answered "absolutely not." (*Id.* at 48:2-4.)

Indeed, Vision Financial Markets LLC, a SEG 1 Customer, has been added to the Liquidation Trust Committee as an *ex officio* SEG 1 member. While Vision Financial Markets LLC is a SEG 1 Customer that accepted the settlement and voted in favor of the Plan, it certainly represents a portion of the SEG 1 constituency. Thus, the Plan Objectors' argument that SEG 1 Customers are not represented on the Liquidation Trust Committee

-44-

fails.   Section 1129(a)(5)(A) does not require that every creditor of a debtor must be

represented by post-confirmation management.   Rather, it requires the appointment of a

director, officer, or voting trustee of the debtor shall be "consistent with the interests of

creditors and equity security holders and with public policy. . . ."   11 U.S.C. §

1129(a)(5)(A)(ii).

The Court finds that the Liquidation Trust Agreement contains sufficient safeguards

with respect to post-confirmation governance of Sentinel's estate to ensure that the interests

of creditors and equity security holders are protected.   Accordingly, the Court finds that the

Plan Proponents have satisfied the requisites of § 1129(a)(5)(A)(ii), and overrules the

objection to the Third Amended Plan on this basis.

Next, the Plan Objectors argue that the lack of the Liquidation Trustee's experience

in litigation matters, the lack of a bond underlying his actions, and the hundreds of millions

of dollars at issue require the appointment of an institutional co-trustee to work with the

Liquidation Trustee to administer the Liquidation Trust.   According to the Plan Objectors,

because this case could proceed for years, and an individual could suffer from potential

health related issues, the appointment of an institutional co-trustee mitigates the undue risk

to the estate from relying on a single individual.   The Plan Objectors reference the testimony

of the Trustee where he admitted that he has no experience supervising outside counsel in

litigation, budgeting for large litigation, or serving as a Chapter 11 trustee or receiver.

(Confirmation Hearing, Aug. 12, 2008 Transcript at 151:21-152:8.)

This line of reasoning amounts to little more than a whisper in the wind.   It is an

argument without substance because the Trustee has thus far admirably performed his job

as the Chapter 11 trustee.   To that end, the Plan Objectors fail to cite any authority for this

-45-

position, and they do not state which provision of the Code the Third Amended Plan allegedly violates in this respect.[15]  "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived. . . ."  *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000).  The Court does not have a duty to research and construct legal arguments available to a party.  *See Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 635 (7th Cir. 1995).  Moreover, a litigant who fails to support a request with pertinent authority forfeits that request.  *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 922 (7th Cir. 1997); *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990).  Thus, the Plan Objectors forfeit this argument.

In conjunction with the § 1129(a)(5) objection, the Plan Objectors contend the Plan violates § 1129(a)(2).  Because the Court found that § 1129(a)(5) does not apply here, § 1129(a)(2) has not been violated.  In short, the Court overrules the objection to the Third Amended Plan under §§ 1129(a)(2) and (a)(5).

> **6.**    **Whether the Third Amended Plan's treatment of the prime portfolio claims violates 11 U.S.C. § 1129(a)(7) by distributing to SEG 1 Customers less than the amount they would receive in a Chapter 7 liquidation.**

Section 1129(a)(7) provides that each holder of an impaired claim who has rejected a plan must "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . if the debtor were liquidated under chapter 7 . . . on such date."  11 U.S.C. § 1129(a)(7).  This section is often referred to as the "best-interest-of-creditors" test.

_____

[15] The Court places this argument under the § 1129(a)(5) portion of the Opinion only because it was lumped with the Plan Objectors' argument regarding the composition of the Liquidation Trust Committee.

-46-

*Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441

(1999). "Best interest" means that either (1) each holder of a claim or interest of each class

has accepted the plan or (2) the nonaccepting class member will receive under the plan at

least as much as it would receive upon liquidation. *In re Keck, Mahin & Cate*, 241 B.R. 583,

590 (Bankr. N.D. Ill. 1999). All claimants in a class of claims that is impaired under the

proposed plan must be accorded treatment under the plan at least as good as treatment they

would receive upon the liquidation of the debtor under Chapter 7. *Rusty Jones*, 110 B.R. at

373. "The 'best interest' test applies to individual creditors holding impaired claims, even

if the class as a whole votes to accept the plan." *Keck, Mahin & Cate*, 241 B.R. at 590

(*quoting 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13).

        In the instant matter, the Plan Objectors assert that the Plan Proponents' act of

pooling all funds held by Sentinel results in the Third Amended Plan distributing an amount

less than the amount that the Plan Objectors would receive in a Chapter 7 liquidation.

Essential to this analysis is a basic understanding of the rules and regulations by which

Sentinel was required to abide by as an FCM (but apparently did not).

        Pursuant to the CEA (7 U.S.C. § 1 *et seq.*) and related regulations promulgated by

the CFTC, FCMs are permitted to deposit their customer funds only with certain types of

banks, depositories, or other FCMs. Sentinel registered with the CFTC as an FCM, and thus

was able to manage customer funds belonging to other FCMs–i.e., those investing in SEG

1 and SEG 2. Unlike traditional FCM's, Sentinel purportedly did not engage in any

commodities trading for its customers, but instead only invested funds deposited by other

FCMs and Sentinel's other customers.

-47-

Because Sentinel was an FCM managing funds required to be segregated for the benefit of its SEG 1 Customers, Sentinel, was subject to the provisions of the CEA and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10. Pursuant to § 4d(a)(2) of the CEA, Sentinel was required to account separately for the money, securities, and property of SEG 1 Customers and could not commingle such customers' assets with its own funds. *See* 7 U.S.C. § 6d(a)(2). Moreover, § 4d(b) of the CEA provides that "it shall be unlawful for any person . . . that has received any money, securities or property for deposit in a separate account as provided for in [§ 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant." 7 U.S.C. § 6d(b). However, a FCM does not need to maintain each customer's funds in an individual account. A FCM may commingle customer funds received from multiple customers in a single consolidated account. Such a consolidated customer fund account is generally called a segregated account because CFTC rules require that it be "segregated as belonging to commodity or option customers." 17 C.F.R. § 1.20(a). In this regard, the FCMs that did business with Sentinel consolidated their own customers' funds not immediately needed for the margining of trades and turned the funds over to Sentinel. Sentinel, in turn, allegedly consolidated the originating FCMs' deposits into a combined segregated account, which it designated as "SEG 1." The SEG 1 customer funds were subject to the strict investment standards embodied in CFTC Rule 1.25. Rule 1.25 restricts investment of customer funds to only the highest grade corporate and government securities and similarly highly liquid investments. *See* 17 C.F.R. § 1.25.

-48-

Despite the statutory requirements of the CEA and CFTC Rules, the Plan Proponents

selected a "net investment" method for calculating investors' claims. According to the

Disclosure Statement, this method computes a customer's claim by adding cash deposits less

cash withdrawals. (Disclosure Statement p. 31.) The Plan Proponents justify the use of the

"net investment" method as a result of the alleged significant commingling and misuse of

Customers' money by Sentinel's principals. The Trustee supported the Plan Proponents'

point of view by providing the following testimony at the Confirmation Hearing:

> [T]here was significant misappropriation of customer assets
> at Sentinel. . . .[T]he daily operating procedures of Sentinel
> involved commingling of different customer groups with the
> . . . proprietary activity or house activity of Sentinel.

> With respect to statements that were sent to customers, those
> statements were very inaccurate, particularly as far as the
> values of assets that were reported to customers. . . I don't
> believe that the segregation rules were complied with at all by
> Sentinel.

(Confirmation Hearing Trans. August 12, 2008 at 35:1-14.)

The Trustee expounded upon his overview by providing:

> Significant portions of customer securities were removed
> from custody--from customer segregated fund accounts and
> were held in a . . . commingled, all inclusive loan and
> collateral account that was not segregated. . . . Deposits
> would be made into a customer segregated account. They
> would be immediately transferred to an account that was
> called the SEN account. And in this particular account,
> which was a nonsegregated account, all customer deposits, all
> customer withdrawals went through this account. And that
> was without regard to what segregation category they were or

> without regard to whether these were house funds or
> customer funds. In addition, all purchases and sales of
> securities went through this single, commingled account....
> [The SEN] account also served as the loan account and the
> collateral account for the Bank of New York. So often
> customer deposits would go into this account and would be
> used to reduce the loan amount from the Bank of New York.

(*Id.* at 41:13-42:19.)

The Plan Objectors responded by asserting that the Plan Proponents have not established that Customer Property cannot be traced[16] and that the "net investment" method for calculating claims fails the "best-interest-of-creditors" test pursuant to § 1129(a)(7). In contrast to the "net investment" method of calculating claims, the Plan Objectors argue that the "net equity" method provides a more balanced result for SEG 1 Customers. The "net equity" method is a hypothetical liquidation value of the securities allocated to a customer by Sentinel. (Disclosure Statement p. 31.) As a part of the hypothetical liquidation value, the Court believes Sentinel would account for the SEG 1 Customers' investments in the segregated Rule 1.25 account, and then separate the SEG 3 Customers' investments between two of the primary investment portfolios maintained by Sentinel—namely, the "Rule 1.25 Portfolio" and the "Prime Portfolio." As stated above, the Rule 1.25 Portfolio was very similar to the SEG 1 Customer segregated portfolio in which Sentinel was obligated by law to segregate and invest in a limited class of very conservative investments. The Prime Portfolio, on the other hand, offered investments with higher risks and potentially higher returns. Given the well-publicized market conditions, the market value of the securities held

---

[16] The Court notes that whether the Customer Property can be traced is not before the Court, and the Court will not address this matter as it is not central to the requirements of confirmation. Rather, the issues related to tracing are reserved for adjudication in the pending Adversary Proceedings. *See supra* n.8.

-50-

in the Prime Portfolio has lost considerable value in comparison to those in the Rule 1.25

Portfolio. Therefore, the Plan Objectors argue that to the extent that the SEG 1 Customers'

Rule 1.25 funds and SEG 3 Customers that invested in the Rule 1.25 Portfolio can be traced,

the SEG 3 Rule 1.25 investors and SEG 1 Customers (assuming the administrative expense

associated with tracing the specific investments does not have a great impact on the

estate—which the Court cannot determine at this time) would receive more in a hypothetical

Chapter 7 liquidation.

   In response, the Plan Proponents assert that the administrative costs associated with

converting a case of this magnitude would be so great that it would offset, and could cause

a significant drain on, the amount of assets available for distribution. This is seen in the

liquidation analysis attached as Exhibit B to the Disclosure Statement. Exhibit B provides

that the estimated Chapter 7 administrative claims, including a Chapter 7 trustee's fee would