**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SENTINEL MANAGEMENT GROUP, INC., | ) | Case No. 07-14987 |
| | ) | |
| | ) | Hon. John H. Squires |
| Debtor. | ) | |

**FINAL APPLICATION OF NAVIGANT CONSULTING, INC. AS
FINANCIAL ADVISORS FOR FREDERICK J. GREDE AS THE CHAPTER 11
TRUSTEE FOR SENTINAL MANAGEMENT GROUP, INC. FOR COMPENSATION
FOR SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES
INCURRED FOR THE PERIOD FROM AUGUST 31, 2007 TO DECEMBER 17, 2008**

Navigant Consulting, Inc. ("NCI"), financial advisors to Frederick J. Grede as the Chapter 11 Trustee (the "Trustee") for Sentinel Management Group, Inc. (the "Debtor" or "Sentinel"), pursuant to 11 U.S.C. §330, the Order Approving Appointment of a Trustee (the "Trustee Retention Order"), the Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals, the Trustee and Committee Members entered by this Court on November 8, 2007 (the "Administrative Order") and the Stipulation and Consent Order Regarding Adequate Protection of Customer Interests entered by this Court on January 10, 2008 (the "Customer Adequate Protection Stipulation"), hereby submits its Final Application for allowance and payment of compensation in the amount of $6,300,007.00 for actual, reasonable and necessary professional services rendered and reimbursement for the actual, reasonable and necessary expenses incurred of $109,149.71 during the period from August 31, 2007 through December 17, 2008 (the " Final Compensation Period"). In further support of this Final Application, NCI respectfully states as follows:

1

## I.   INTRODUCTION

1. This Court has jurisdiction over this Final Application pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief requested herein is section 330 of Title 11 of the United States Code (11 U.S.C. §§ 101-1532, the "Bankruptcy Code"), as supplemented by Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 5082-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules"), the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 promulgated by the United States Department of Justice, dated on January 30, 1996 (the "UST Guidelines"), the Administrative Order and the Customer Adequate Protection Stipulation (collectively, the "Guidelines").

## II.   SUMMARY OF SENTINEL'S CASE

3. Sentinel is an Illinois corporation, headquartered prior to the bankruptcy in Northbrook, Illinois. Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser ("Investment Adviser"), and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM"). It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization.

4. Sentinel managed investments of cash for various clients, including other FCMs, hedge funds, financial institutions, pension funds, and individuals. As of July 31, 2007, Sentinel claimed to have $1.5 billion in client assets under management.

5. Sentinel divided its customers into four groups, and under applicable law was

2

supposed to strictly segregate the investments of these four customer groups from each other, and from Sentinel's own funds.

6. On August 13, 2007, Sentinel sent a letter to its customers representing that it could no longer honor redemptions due to a liquidity crisis.

7. On August 16, 2007 Sentinel entered into an agreement to sell to Citadel Equity Fund, Ltd. and Citadel Limited Partnership the bulk of the securities purportedly associated with "SEG 1" (FCM) customer accounts.

8. On August 16 and 17, 2007, several customers sued Sentinel and sought and obtained temporary restraining orders prohibiting transfers of securities purportedly segregated for their benefit. On the afternoon of August 17, the NFA issued a Member Responsibility Action prohibiting Sentinel from selling, transferring, encumbering or otherwise disposing of certain assets.

9. On the evening August 17, 2007 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10. On August 20, 2007, the Debtor distributed what was purported to be the proceeds of the Citadel sales transaction to SEG 1 customers. Soon thereafter, the Debtor consented to the appointment of a chapter 11 trustee.

11. Pursuant to Orders of this Court dated August 23 and 29, 2007, on August 28, 2007, Frederick J. Grede was appointed as the chapter 11 trustee of the Debtor by the United States Trustee. He has accepted his appointment, and is acting, duly qualified, as Trustee of the Debtor.

12. On September 13, 2007 the Trustee filed an application for authority to employ NCI as financial advisors (the "Retention Application").

13. On September 20, 2007, the Court authorized the employment of NCI as financial advisors effective as of August 31, 2007. A copy of the Order Approving the

Application to Retain and Employ NCI (the "Retention Order") is annexed hereto as Exhibit A.

14. Following his appointment, the Trustee conducted an extensive investigation into Sentinel's business operations. As a result of that investigation, the Trustee determined (among other things) that certain Sentinel insiders failed to observe requirements that customer funds and securities be segregated. Instead, certain insiders used hundreds of millions of dollars in securities that were supposed to be segregated as collateral for loans used to support trading that generated millions of dollars of profit for the benefit, and to finance more than $ 3.0 billion in leveraged repurchase agreement transactions.

15. The Fourth Amended Chapter 11 Plan of Liquidation (the "Plan") was confirmed by this Court on December 15, 2008 and became effective on December 17, 2008. The Trustee, in his capacity as the Liquidation Trustee of the Sentinel Liquidation Trust, is now making interim distributions, pursuing litigation, and undertaking certain other matters described below.

16. NCI is assisting the Trustee in winding down Sentinel's business operations, liquidating the portfolio of securities held by Sentinel, and undertaking the other matters described below.

**III.    PROFESSIONAL COMPENSATION AND REIMBURSEMENT**

**OF EXPENSES REQUESTED**

17. On September 20, 2007, the Court entered the Retention Order authorizing the employment of NCI as financial advisors effective as of August 31, 2007.

18. On November 8, 2007, the Court entered the Administrative Order. Pursuant to the Administrative Order, the Court established a procedure for interim compensation and reimbursement of expenses for professionals appointed in these cases.

19. On January 10, 2008, the Court entered the Customer Adequate Protection

Stipulation, pursuant to which customers of the Debtor are granted adequate protection, if applicable and as set forth in the Customer Adequate Protection Stipulation, pursuant to section 361 and 363(e), for the use of property to make payments to professionals in accordance with the Administrative Order.

20. Prior to this Final Application, NCI submitted its First through Third Interim Fee Applications.

21. The hourly rates charged by NCI for the services provided by its personnel differ based upon, among other things, each professional's level of experience and types of services being provided. In the ordinary course of business, NCI periodically revises its hourly rates to reflect promotions and other changes in personnel responsibilities, increases in experience, and increases in the cost of doing business.

22. For the First Interim Application Period from August 31, 2007 – December 31, 2007, NCI requested payment of $2,270,373.25 in professional fees and $55,478.69 in expenses for a total of $2,325,851.94. The Court allowed $2,253,829.00 in professional fees and $47,435.90 in expenses, for a total of $2,301,264.90, for the First Interim Application Period.

23. For the Second Interim Application Period from January 1, 2008 – April 30, 2008, NCI requested payment of $1,721,606.00 in professional fees and $64,354.68 in expenses for a total of $1,785,960.68. The Court allowed $1,721,606.00 in professional fees and $64,354.68 in expenses, for a total of $1,785,960.68, for the Second Interim Application Period.

24. For the Third Interim Application Period from May 1, 2008 – August 31, 2008, NCI requested payment of $1,335,509.50 in professional fees and $12,473.94 in expenses for a total of $1,347,983.44. The Court allowed $1,328,957.00 in professional fees

and $12,473.94 in expenses, for a total of $1,341,430.94, for the Third Interim Application Period.

25. During the period from September 1, 2008 through December 17, 2008 (the "Current Compensation Period"), NCI has submitted four monthly fee statements to the Notice Parties.  In the Thirteenth Fee Statement (September 1 – September 30, 2008), NCI sought aggregate fees of $230,671.50 and incurred aggregate expenses of $145.34.  In the Fourteenth Fee Statement (October 1 – October 31, 2008), NCI sought aggregate fees of $248,285.50 and incurred aggregate expenses of negative $17,448.68 (credit balance).  In the Fifteenth Fee Statement (November 1 – November 30, 2008), NCI sought aggregate fees of $244,040.00 and incurred aggregate expenses of $19.32.  In the Sixteenth Fee Statement (December 1 – December 17, 2008), NCI sought aggregate fees of $225,495.00 and incurred aggregate expenses of $2,169.21.  In addition, NCI has identified 112.3 hours and $47,123.00 in fees that have been inadvertently omitted from prior monthly fee statements and Interim Fee Applications related specifically to the preparation of NCI's monthly fee statements in the format specifically requested by this Court for the period August 31, 2007 through November 30, 2008.  A summary schedule of these hours and fees and the detailed time reports is annexed hereto as Exhibit D.

26. NCI has incurred $995,615.00 for professional services rendered during the Current Compensation Period and incurred negative $15,114.81 (credit balance) for expenses during the Current Compensation Period, for total professional fees and expenses of $980,500.19.

27. NCI has been paid $578,397.60 for professional services rendered during the Current Compensation Period and negative $17,284.02 (credit balance) for expenses incurred during the Current Compensation Period, for total payments of $561,113.58.

|  | Thirteenth Fee Statement | Fourteenth Fee Statement | Fifteenth Fee Statement | Sixteenth Fee Statement |  |
|---|---|---|---|---|---|
| Period | 9/1 – 9/30/08 | 10/1 – 10/31/08 | 11/1 – 11/30/08 | 12/1 – 12/17/08 | Total |
| Total Fees | $230,671.50 | $248,285.50 | $244,040.00 | $225,495.00 | $948,492.00 |
| Total Expenses | 145.34 | (17,448.68) | 19.32 | 2,169.21 | (15,114.81) |
| **Total** | **$230,816.84** | **$230,836.82** | **$244,059.32** | **$227,664.21** | **$933,377.19** |
|  |  |  |  |  |  |
| 80% Fees | $184,537.20 | $198,628.40 | $195,232.00 | $180,396.00 | $758,793.60 |
| Total Expenses | 145.34 | (17,448.68) | 19.32 | 2,169.21 | (15,114.81) |
| **Total** | **$184,682.54** | **$181,179.72** | **$195,251.32** | **$182,565.21** | **$743,678.79** |
|  |  |  |  |  |  |
| **Holdback** | **$46,134.30** | **$49,657.10** | **$48,808.00** | **$45,099.00** | **$189,698.40** |
|  |  |  |  |  |  |
| Paid Fees | $184,537.20 | $198,628.40 | $195,232.00 | $0.00 | $578,397.60 |
| Paid Expenses | 145.34 | (17,448.68) | 19.32 | 0.00 | (17,284.02) |
| **Total** | **$184,682.54** | **$181,179.72** | **$195,251.32** | **$0.00** | **$561,113.58** |

28. In accordance with the Guidelines, NCI seeks final allowance and payment herein of (a) compensation in the amount of $948,492.00 for the actual, reasonable and necessary services rendered to the Trustee and reimbursement of negative $15,114.81 (credit balance) for the actual, reasonable and necessary expenses incurred during the Current Compensation Period, and (b) total compensation in the amount of $6,300,007.00 for the actual, reasonable and necessary services rendered to the Trustee and reimbursement of $109,149.71 for the actual, reasonable and necessary expenses incurred during the Final Compensation Period.

29. The fees sought by this Final Application reflect an aggregate of 18,602.6 hours of NCI's time spent and recorded in performing services during the Final Compensation Period. This fee request does not include time that might be construed as duplicative or otherwise not beneficial to the Trustee or the Debtor's estate, which has already been eliminated by NCI. In accordance with the factors enumerated in section 330 of

the Bankruptcy Code, the amount of fees requested is fair and reasonable given: (a) the complexity of this case, (b) the time expended, (c) the nature and extent of the services rendered, (d) the value of such services, and (e) the costs of comparable services other than in a case under the Bankruptcy Code.

30. All of the services for which final compensation is sought were rendered solely in connection with this case, in furtherance of the duties and functions of the Trustee and not on behalf of any individual creditor or other person.

31. NCI has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in this case.

32. NCI has not shared, or agreed to share, (a) any compensation it has received or may receive with another party or person, other than with the members, counsel and associates of the firm, or (b) any compensation another person or party has received or may receive. No promises have been received by NCI as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code.

33. To the extent that time or disbursement charges for services rendered or disbursements incurred relate to the Final Compensation Period, but were not processed prior to the preparation of this Final Application, NCI reserves the right to request additional compensation for such services and reimbursement of such expenses.

34. NCI maintains written records of the time expended in the rendition of the professional services provided. Attached hereto as <u>Exhibit B</u> are consolidated summaries of the fee statements provided to the Notice Parties in the Current Compensation Period. Attached hereto as <u>Exhibit C</u> is the comprehensive time and expense detail for the Current

8

Compensation Period provided to the Notice Parties.[1]  These exhibits set forth the aggregate time expended, the hourly billing rate and detailed descriptions of work performed.  The compensation requested by NCI is based on the customary compensation charged by comparably skilled practitioners in these cases.

### IV.   SUMMARY OF PROFESSIONAL SERVICES RENDERED

35. During the Final Compensation Period, NCI performed a wide variety of tasks in connection with the administration of the Debtor's case.  The Debtor's case involves more than a billion dollars in liabilities, and is unique in several respects.  The scant precedent available concerning this unusual non-commodity trading FCM, the significant fraud perpetrated by certain Sentinel insiders, and the few remaining employees have resulted in significant challenges in the administration of the Debtor's estate, and this case raises several complicated issues of first impression.

36. Since the filing of the First, Second and Third Interim Applications (together, the "Prior Interim Applications"), this Court has entered, on December 15, 2008, an Order confirming the Plan.  Because the Prior Interim Applications contain lengthy descriptions of matters handled during those time periods, this Final Application does not repeat all of that detail.  The following descriptions of matters therefore pertain solely to matters handled during the Current Compensation Period.

37. To provide an orderly and meaningful summary of the services rendered by NCI in accordance with the Administrative Order, NCI has summarized the services provided by the project billing categories.  The following summary is intended to highlight the services rendered in each separate billing category and is not intended to be a comprehensive

---

[1] NCI has attached invoices related to the Current Compensation Period only since invoices for the other periods in the Final Compensation Period were included in the Prior Interim Applications.  NCI will provide copies of the invoices from the Prior Interim Applications upon request.

detailed description of the work performed. Detailed descriptions of the day-to-day services provided and the time expended performing such services in each project billing category have been provided to the Trustee, counsel to the Committee, and the U.S. Trustee pursuant to the Administrative Order and are attached in Exhibit C. Attached hereto as Exhibit E is a summary by project category the fees generated by the services performed during the Final Compensation Period and, for each separate project category, a list of each professional providing services on the project, a statement of the number of hours spent and the amount of compensation requested for each professional on the project.

| Matter Codes | Description | Hours | Fees | Blended Rate |
|---|---|---|---|---|
| A | Meeting/Teleconference with Trustee, Trustee Counsel | 28.0 | $12,485.50 | $445.91 |
| B | Meeting/Teleconference with Debtor Management or Counsel | 1.0 | 415.00 | 415.00 |
| C | Meeting/Teleconference with Creditor Committee or Counsel | 4.5 | 2,460.00 | 546.67 |
| D | Meeting/Teleconference with Bank Group/Counsel/Advisors | 0.0 | 0.00 | 0.00 |
| E | Research & Consultation for Financial Reporting | 34.9 | 12,564.00 | 360.00 |
| F | Research & Consultation for Bankruptcy Reporting | 454.9 | 149,629.50 | 328.93 |
| G | Research & Analysis for Litigation/Complaint Support | 2,146.3 | 684,900.00 | 319.11 |
| H | Research & Preservation of Data/Documents | 7.9 | 2,133.50 | 270.06 |
| I | Research & Consultation for Operations of the Debtor | 139.0 | 50,040.00 | 360.00 |
| J | Monthly Operating Reports | 38.5 | 14,007.50 | 363.83 |
| K | Case Administration | 38.0 | 12,519.50 | 329.46 |
| L | Court hearings/preparation | 1.5 | 567.50 | 378.33 |
| M | Fee Application | 13.5 | 4,970.00 | 368.15 |
| N | Contract Review | 0.0 | 0.00 | 0.00 |
| O | Tax Issues/Tax Consulting | 5.0 | 1,800.00 | 360.00 |
|  | **Total** | **2,913.0** | **$948,492.00** | **$325.61** |

38. During the Final Compensation Period, NCI performed many, oftentimes complex, services for the Trustee and Trustee's counsel related to the bankruptcy and in support of many litigation issues. NCI supports the Trustee in reporting to the Court, preparing multiple analyses and requests from the Creditors' Committee, general operations of the business including millions of dollars in securities transactions including coupon, maturity, principal and sales receipts as well as issues relating to taxes, the pension plan,

10

vendor payments and transitioning the debtor's offices. In addition, NCI supports the Trustee and the Trustee's counsel in preparing analyses and providing information for actual and potential litigation and complaint support. Most company personnel, and their corresponding knowledge of the company, transactions, reports and processes, are unavailable to NCI. The following details those activities:

      A. Meeting/Teleconference with Trustee, Trustee Counsel. NCI expended 28.0 hours and incurred fees of $12,485.50 for a blended billing rate of $445.91 for this project task during the Current Compensation Period. This time includes meetings and conference calls with the Trustee and Trustee's counsel on bankruptcy related issues, including monthly operating reports, tax and pension issues, sale of securities and related issues, creditors committee requests, preparation for meetings with the creditors committee and litigation issues including strategy discussions, review of analysis and work product and preparation for meetings with regulatory agencies including, but not limited to the SEC, CFTC, NFA and the U.S. Department of Justice.

      B. Meeting/Teleconference with Debtor Management, Management Counsel. NCI expended 1.0 hour and incurred fees of $415.00 for a blended billing rate of $415.00 for this project task during the Current Compensation Period. This time was incorrectly categorized under this project task in the December 1-17 fee statement and should have been categorized under project task G.

      C. Meeting/Teleconference with Creditors Committee, Committee Counsel. NCI expended 4.5 hours and incurred fees of $2,460.00 for a blended billing rate of $546.67 for this project task during the Current Compensation Period. This time includes 0.5 hours for discussion regarding Committee Counsel billing matters. 4.0 hours was incorrectly categorized under this project task in the October 1-31, 2008 fee statement and should have been categorized under project task G.

D. Meeting/Teleconference with Bank Group, Bank Counsel. NCI did not devote any time to this category in the Current Compensation Period.

E. Research and Consultation for Financial Reporting. NCI expended 34.9 hours and incurred fees of $12,564.00 for a blended billing rate of $360.00 for this project task during the Current Compensation Period. This includes closing the Debtor's books and records on a monthly basis, preparing the balance sheet for the creditors' committee, reconciling coupon, principal and maturity receipts to prior month, and preparing responses and analyses for the creditors' committee.

F. Research and Consultation for Bankruptcy Reporting. NCI expended 454.9 hours and incurred fees of $149,629.50 for a blended billing rate of $328.93 for this project task during the Current Compensation Period. This time includes many formal information requests, analyses and projects requested by and performed for the creditors' committee and other bankruptcy related analysis for the Trustee. Specifically, as requested by the creditors' committee and/or the Trustee, NCI performed various complex analyses including cash flow analyses, preference analyses, net equity analyses, substantial comparison analyses, coupon reconciliation, analyses of sales of various securities and sales transactions, claim reconciliation, repurchase transactions analyses, distribution plan, disclosure statement, and property of the estate analyses.

G. Research and Analysis for Litigation/Complaint Support. NCI expended 2,146.3 hours and incurred fees of $684,900.00 for a blended billing rate of $319.11 for this project task during the Current Compensation Period. This work included forensic accounting investigation, data assessment and analyses, document indexing, and general litigation support. Equally important, time associated with this work included the preparation of supporting analyses, discovery process management, and the preparation of exhibits for adversary

complaints filed against certain insiders of the Debtor, The Bank of New York, McGladrey & Pullen, Keefe, Bruyette & Woods, Inc. ("KBW"), FTN Financial Securities Corp. ("FTN"), Cohen & Company Securities, LLC ("Cohen"), Citadel Equity Fund, Ltd., Citadel Limited Partnership, and Citadel Investment Group, L.L.C., (collectively referred to herein as "Citadel"), and other recipients of preferential and fraudulent transfers.  On October 11, 2007, the Trustee filed an adversary complaint (the "Insiders Adversary") against certain insiders of the Debtor and certain trusts and investment vehicles controlled by those insiders (collectively, the "Insiders"), alleging that the Insiders devised and participated in a series of interrelated schemes to defraud Debtor and its customers, including, inter alia, (a) fraudulent representations about the nature of the investments; (b) keeping three sets of records reflecting allocation of securities; (c) fraudulent and undisclosed leveraging; (d) diverting customer assets to collateralize the house loan; (e) commingling customer assets; (f) diverting and misallocating interest income; (g) extracting unlawful trading profits; (h) failing to allocate trades when made and reallocating trades; (i) issuing false and misleading customer statements; (j) improperly paying Sentinel Investment Group, Inc. an "administrative" or "management fee."  On March 20, 2008, the Trustee filed an adversary complaint (the "M&P Adversary") against McGladrey & Pullen, LLP and G. Victor Johnson.  On March 3, 2008, the Trustee filed an adversary complaint (the "BONY Adversary") against The Bank of New York and The Bank of New York Mellon Corp.  On January 12, 2009, the Trustee filed a complaint against KBW in the District Court.  On November 17, 2008, the Trustee filed a complaint against securities brokers Stephen M. Folan, Jacques de Saint Phalle, and FTN for aiding and abetting a breach of fiduciary duty, commercial bribery, securities fraud, violation of the Illinois Blue-Sky law, violation of the Illinois Consumer Fraud Act, negligence and unjust enrichment, as well as for the avoidance of transfers of cash and securities to FTN worth hundreds of millions of dollars made with the actual intent to hinder, delay and defraud Sentinel's creditors.  On January 12,

2009, the Trustee filed a complaint against Cohen in the District Court. On December 4, 2008, the Trustee filed an adversary complaint against Citadel for avoidance and recovery of fraudulent transfers of Sentinel securities to Citadel on the eve of Sentinel's bankruptcy and for reformation and breach of contract, as well as against Goldman Sachs & Co. ("Goldman"), which is the immediate transferee of the securities from Citadel and agreed to split the profits from subsequent securities sales with Citadel (the "Citadel Adversary").

H. Research and Preservation of Data/Documents. NCI expended 7.9 hours and incurred fees of $2,133.50 for a blended billing rate of $270.06 for this project task during the Current Compensation Period. Due to the litigious nature of the case, NCI was required to maintain the chain of custody, secure and preserve all emails, phone call recordings, voicemails, hard and soft copy documents, network servers and computer hard drives. Additionally, to preserve and create the existing security accounting data and structure, NCI extracted the critical data from the Sentinel network, recreated a secure database structure, performed strict quality control standards on this information and levered this information in order to address Trustee and creditor committee requests more efficiently.

I. Research and Consultation for Operations of the Debtor. NCI expended 139.0 hours and incurred fees of $50,040.00 for a blended billing rate of $360.00 for this project task during the Current Compensation Period. As of the end of March 2008, the Debtor no longer had any employees and, as a result, NCI was required to assume many of the day-to-day operations of the business including tracking daily coupon, maturity, principal and sales receipts, reconciliation of receipts to bank records, and other general business operations. In addition, the Debtor's offices were closed, fixed assets were liquated, and telephone, fax and mail were routed to the NCI offices.

J. Monthly Operating Reports. NCI expended 38.5 hours and incurred fees of

$14,007.50 for a blended billing rate of $363.83 for this project task during the Current Compensation Period. NCI prepares the monthly operating report required by the U.S. Trustee's office. Preparation of the monthly operating reports consist of reconciliation of the cash receipts and disbursements among the Debtor's thirty-six (36) bank accounts including, but not limited to, coupon, interest, dividend, and principal receipts from the security portfolio on a per security basis, as well as proceeds received from the maturity or sale/liquidation of the security portfolio. In addition, NCI reconciles the Debtor's disbursements for necessary operating expenses such as vendor payments and professional fees.

K. Case Administration. NCI expended 38.0 hours and incurred fees of $12,519.50 for a blended billing rate of $329.46 for this project task during the Current Compensation Period. Due to the bankruptcy filing and litigious nature of the case, NCI had twenty-five (25) consultants working on the case at various times. NCI carefully assigned consultants in view of the experience and expertise required for a particular task and due to the complexity of the case. NCI expended time to case administration for reviewing and updating project work plans with over fifty (50) discreet projects, transferring of knowledge on processes and procedures and staying on task with project deliverables. Also, included and attached hereto as <u>Exhibit D</u> are fees related to the preparation of Navigant's monthly fee statements for the period August 31, 2007 through November 30, 2008 which have been inadvertently omitted from prior monthly fee statements and the Prior Interim Applications. NCI expended 112.3 hours and incurred fees of $47,123.00 for a blended billing rate of $419.62 for this project task during the Final Compensation Period.

L. Attendance at/Preparation for Court Hearings. NCI expended 1.5 hours and incurred fees of $567.50 for a blended billing rate of $378.33 for this project task during the Current Compensation Period. NCI expended time on this task preparing for and attending the

hearing related to the Third Interim Application.

  M. Fee Application.  NCI expended 13.5 hours and incurred fees of $4,970.00 for a blended billing rate of $368.15 for this project task during the Current Compensation Period.  NCI filed its Third Interim Application on September 30, 2008 which included more than $1.3 million in fees and expenses and detailed time and expenses for twenty (20) financial advisors.

  N. Contract Review.  NCI did not devote any time to this category in the Current Compensation Period.

  O. Tax Issues/Tax Consulting.  NCI expended 5.0 hours and incurred fees of $1,800.00 for a blended billing rate of $360.00 for this project task during the Current Compensation Period.  The time devoted to this task included review of net operating losses, preparation of information for the 2006 and 2007 tax returns, meetings with the Debtor's tax advisor and preparation of 1099 reports.

  39. During the Current Compensation Period, NCI incurred a net credit of negative $15,114.81 (credit balance) in expenses related to the reconciliation of Nexidia services rendered and payment.  Nexidia overcharged NCI throughout the case and issued a refund credit on October 10, 2008 in the amount of negative $19,596.00 (credit balance).  This refund credit has been netted against all other expenses for the Current Compensation Period.  <u>Exhibit B</u> summarizes those expenses for the Current Compensation Period and <u>Exhibit C</u> details those expenses for the Current Compensation Period.  The expenses requested by NCI are typical in cases of this size and complexity.  Included in these expenses are charges for a commonly utilized third party data discovery servicer that is able to apply search criteria to voice recordings for review, postage and reference materials related to the litigation projects.  Due to the data discovery and preservation of information related to

litigation, NCI purchased computer hard drives and software to store, process and access Debtor information which is typical on these cases. Also, included are expenses related to messengering original documents to attorneys. Ground transportation from NCI offices to Jenner & Block offices for meetings are also included.

40. Due to the litigious nature of the case, NCI was required to maintain the chain of custody, secure and preserve all emails, phone call recordings, voicemails, hard and soft copy documents, network servers and computer hard drives. To date, NCI has downloaded over 1,400 hours of audio recordings from the Sentinel servers which included recorded voicemails and conversations. NCI utilized Nexidia, Inc., a leading provider of scalable audio mining and speech analytic software, to process the thousands of hours of audio recording. The use of Nexidia for the audio processing significantly reduces the cost to the estate compared to NCI performing those services. Additionally, due to NCI's relationship with Nexidia, NCI has received certain discounts not readily available to the public. In order to secure this massive amount of audio recordings, NCI had to purchase hard drives and specific software to store the information. These hard drives and related software are not standard office supplies readily available to NCI and storage devices independent from NCI's internal network are required in order to maintain the chain of custody. In addition to the audio downloads, the drives and software were required in order to create forensically sound images of all personal computers and servers. These images, combined with the chain-of-custody, allows for a defensible analysis of the electronic evidence. Without the hard drives and software NCI would not have been able to assist the Trustee with his investigation and ultimate charges that have been filed in court, as well as actions yet to be taken. Images of all of the data were necessary in order to secure the data after employees were released to avoid destruction of the data. The quantity of drives

includes the industry standard of creating a back-up drive to insure data integrity and disaster recovery.

## V. ALLOWANCE OF COMPENSATION

41. The foregoing professional services rendered during the Current Compensation Period, as well as the services discussed in the Prior Interim Applications, were necessary and appropriate to the administration of the chapter 11 case and were in the best interests of the parties in interest. Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, or tasks involved. NCI has taken significant efforts to ensure that the professional services were performed with expedience and in an efficient manner and without duplication of effort.

42. Section 330 provides that a court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual necessary services rendered . . . and reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1). Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded, the court should consider the nature, the extent, and the value of such services, taking into account all relevant factors, including
>
> (A)   the time spent on such services;
>
> (B)   the rates charged for such services;
>
> (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E)   whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than

cases under this title.

Id. § 330(a)(3).

43. In the instant case, NCI respectfully submits that the services for which it seeks compensation in this Final Application were necessary for and beneficial to the Trustee's efforts in administrating the Debtor's estate, and necessary to and in the best interests of the Debtor's estate. NCI further submits that the compensation requested herein is reasonable in light of the nature, extent, and value of such services provided to the Trustee and the Debtor's estate.

44. Many hours were spent by NCI, often under time constraints requiring late night and weekend work, negotiating or analyzing not only routine bankruptcy issues with which NCI is familiar, but also highly technical issues relating to the Debtor's case.

45. The rates charged by NCI in this case are standard for any bankruptcy matter, and are identical to the rates it would charge throughout the country in any bankruptcy case of this size and prominence.

46. In sum, the services rendered by NCI were necessary and beneficial to the Debtor's estate, and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved. As shown by this Final Application and supporting exhibits, NCI provided professional services economically and without unnecessary duplication of effort. In addition, the work involved, and thus the time expended, was carefully assigned in view of the experience and expertise required for a particular task. Accordingly, approval of the compensation sought herein is warranted.

## VI. CONCLUSION

WHEREFORE, NCI respectfully requests (i) allowance and payment of compensation for professional services rendered during the Final Compensation Period in the amount of $995,615.00; (ii) reimbursement for actual necessary expenses NCI incurred during the Final Compensation Period in the amount of negative $15,114.81 (credit balance); and (iii) that the Court grant the Trustee such further relief as is just and proper.

Dated:  January 23, 2009

Navigant Consulting, Inc.

**By:**

David A. Moes
Managing Director

30 South Wacker Drive
Chicago, IL  60606

Financial Advisors for Frederick J. Grede as the Chapter 11 Trustee for Sentinel Management Group, Inc.