## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 07 B 14987 |
| | ) | Chapter 11 |
| SENTINEL   MANAGEMENT   GROUP, | ) | Judge John H. Squires |
| INC., | ) | |
| | ) | |
| Debtor. | ) | |

### MEMORANDUM OPINION

This matter comes before the Court on the objection of Frederick J. Grede, the

Liquidating Trustee (the "Trustee") for the Sentinel Liquidation Trust and estate

representative for the estate of Sentinel Management Group, Inc. ("Sentinel"), to claim

number 90 filed by GAMAG Black & White, Ltd. ("GAMAG"). For the reasons set forth

herein, the Court sustains the objection and disallows the claim without prejudice to

GAMAG's claim in the Lake Shore Proceedings as discussed herein.


### I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and

Internal Operating Procedure 15(a) of the United States District Court for the Northern

District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B).


### II. FACTS AND BACKGROUND

Many of the facts are undisputed and are contained in the joint list of stipulated facts

filed prior to the evidentiary hearing in this matter. (Docket No. 1429.) On August 17, 2007,

Sentinel filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Stip.

-2-

of Facts ¶ 4.) On August 28, 2007, the United States Trustee appointed Frederick J. Grede

as the Chapter 11 trustee for Sentinel's estate under 11 U.S.C. § 1104. The Trustee's

appointment was approved by the Court on August 29, 2007. (Docket No. 105.) GAMAG

is a holding company of hedge funds that was organized under the laws of the Bahamas.

(Stip. of Facts ¶ 12.) It filed the disputed claim at bar contending that it is owed $646,350

by Sentinel.

GAMAG had dealings with one or more entities involved in the Lake Shore Common

Enterprise. The Lake Shore Common Enterprise includes the following entities: Lake Shore

Asset Management Limited ("LSAM"), Lake Shore Group of Companies Inc. Ltd., Lake

Shore Asset Management Inc. ("LSIII"), Lake Shore Alternative Financial Asset Limited

("LSAFA"), Lake Shore Alternative Financial Asset Account I Limited, Lake Shore

Alternative Financial Asset Account II Limited ("LSFL"), Lake Shore Alternative Financial

Asset Fund III Limited and Geneva Corp. Funds World Limited (formerly known as Lake

Shore Alternative Financial Asset Fund IV Limited), Lake Shore Asset Management

Limited, Lake Shore Group of Companies and its subsidiaries and affiliates. (*Id.* ¶1; Trustee

Ex. R at Ex. 5, p. 1 n.2.)

The Lake Shore Common Enterprise was engaged in fraudulent criminal activity,

which caused the United States Commodity Futures Trading Commission (the "CFTC") to

bring an action in the United States District Court for the Northern District of Illinois, Case

No. 07 C 3598 (the "Lake Shore Proceedings"). (Stip. of Facts ¶ 2; Trustee Ex. Q at p. 6, ¶

n.) The CFTC alleged in its one-count complaint filed on June 26, 2007, that LSAM had

improperly refused to make its books and records available for inspection or to provide

-3-

information about its commodity pool participants and trading activity as required by the
Commodity Exchange Act. (Stip. of Facts ¶ 2; Trustee Ex. K at p. 1.) On August 8, 2007,
the CFTC filed a first amended complaint alleging that LSAM was part of a common
enterprise controlled by Philip Baker. (Stip. of Facts ¶ 2; Trustee Ex. K at p. 2.) On June
27, 2007, the District Court entered a restraining order against LSAM that, among other
things, froze LSAM's assets. (Stip. of Facts ¶ 3; Trustee Ex. K at p. 1.)

On October 4, 2007, the District Court appointed Robb Evans & Associates LLC (the
"Receiver") as temporary equity receiver for the Lake Shore Common Enterprise. (Stip. of
Facts ¶ 6; Trustee Ex. H at p. 1.)   The District Court entered an amended order appointing
that Receiver for the Lake Shore Common Enterprise on April 24, 2008. (Stip. of Facts ¶ 7;
Trustee Ex. I.)

The Court confirmed an amended plan of liquidation filed by the Trustee and the
Official Committee of Unsecured Creditors on December 15, 2008, which became effective
on December 17, 2008. (Stip. of Facts ¶ 8.) As of the effective date, the Trustee has been
acting as the Trustee under the agreement establishing the liquidating trust and as the
representative for Sentinel's estate. (*Id.* ¶ 9.)

Sentinel was registered with the Securities and Exchange Commission as an
investment adviser and with the CFTC as a futures commission merchant ("FCM"). (*Id.* ¶
10.)   Sentinel primarily managed investments of short-term cash for various clients,
including other FCMs, hedge funds, financial institutions, pension funds, and individuals.
(*Id.*)  None of the Lake Shore Common Enterprise entities were FCMs. (*Id.*)

-4-

Sentinel and LSAFA, one of the entities among the Lake Shore Common Enterprise, entered into an Investment Advisory Agreement, dated July 24, 2001 (the "Investment Advisory Agreement"), pursuant to which LSAFA appointed Sentinel, and Sentinel accepted the appointment, as "discretionary investment advisor with respect to those assets . . . accepted for investment by Sentinel. . . ." (*Id.* ¶ 11; Trustee Ex. F ¶ 1.) LSAFA signed the Investment Advisory Agreement on its own behalf and not as an agent of any customer. (Trustee Ex. F at p. 3; Trial Tr. p. 48 lines 13-21.)  Thereby, Sentinel was in privity of contract with LSAFA, not GAMAG.

GAMAG, LSIII, and LSAFA entered into a Portfolio Management Agreement (the "Portfolio Management Agreement") pursuant to which GAMAG authorized LSFL to open an account to be maintained with Sentinel and to provide all administrative and other services with respect to that account, and retained LSIII to trade exchangetraded financial derivatives contracts and to make and implement all investment decisions for that account. (Stip. of Facts ¶ 13; GAMAG Ex. No. 4.)  Sentinel did not enter into this contract as a party. (GAMAG Ex. No. 4; Trial Tr. p. 24 lines 3-8.)  In particular, the Portfolio Management Agreement states in pertinent part as follows:

> By signing this contract, you hereby retain Lake Shore Asset Management Inc. ("LSIII") with respect to the funds that you provide from time to time for investment in exchangetraded financial derivatives contracts (the "Contracts") in accordance with an account (the "Account") to be maintained with Sentinel Management Inc. ("Sentinel") as described below. The Account will be opened for you by Lake Shore Alternative Asset Account II Ltd. ("LSFL"), which will also provide all administrative and other services in relation to the Account except the trading decisions which are made by LSIII.

-5-

. . .

> You hereby authorize LSIII to make and implement all
> investment decisions for your Account that LSIII, in its sole
> discretion, deems proper and advisable, subject to the
> provisions of Part 2 of this contract below.

. . .

> When this contract is fully accepted, LSFL will establish an
> Account for you.  Custody of your assets will be with
> Sentinel. . . .  All reporting with respect to your Account will
> be made to you by LSFL, and you acknowledge that if you
> have any questions concerning your Account, you will direct
> them to LSFL and its administrative arm ("Lake Shore
> Administration").

(Stip. of Facts ¶ 14; GAMAG Ex. No. 4 at p. 1.)

With respect to the withdrawal of funds, the Portfolio Management Agreement

provides in pertinent part as follows:

> You are entitled to require Sentinel to release all or any part
> of your invested funds at their then current value, less the
> applicable amount to be retained by LSFL for Profit Incentive
> Fees earned, each Friday, if you make your request by 4:30
> p.m. (New York time E.S.T.) on the previous Thursday. . . .

> The request for a withdrawal can be sent at any time by
> contacting your financial advisor, who completes the Request
> & Notice for Additions/Withdrawals of Funds form (the
> "Additions/ Withdrawals Form") on your behalf and forwards
> this form to Lake Shore Administration. You must sign the
> Additions/Withdrawals Form along with your financial
> advisor. Your request for funds is considered accepted when
> received at the administration office of Lake Shore
> Administration by mail, fax or email. . . .

> On each day that withdrawals are permitted, your account is
> valued as at or about 4:30 p.m. (New York time), the Profit
> Incentive Fees (if any) owing to LSFL are deducted and the
> remaining Account balance is determined.  The proceeds

-6-

owing to you are settled in five business days from the day the
withdrawal is effected, when those funds will be wired
directly to the bank account you specify in this contract. . . .

(Stip. of Facts ¶ 15; GAMAG Ex. No. 4 at p. 4.)

With respect to fees and expenses, the Portfolio Management Agreement provides

in relevant part as follows:

No management fee is charged to your Account.  LSFL
administrates and charges all fees on behalf of this program.
The incentive fees charged by LSFL will be used to pay LSIII.
LSFL charges your account 25% of the "Net New
Appreciation" of your funds, if any, on a monthly basis.  Net
New Appreciation is defined as the excess, if any, of your net
funds (outside of additions to your Account) valued as of the
end of any calendar month. However, the incentive fee is
payable only on net new appreciation. . . .

The FCM through which Contracts are traded will charge
brokerage fees on all transactions for your Account, and these
fees will be payable by you out of the assets in your Account.
You will not receive any interest on the funds held in your
Account.

(Stip. of Facts ¶ 16; GAMAG Ex. No. 4 at p. 4.)

The Portfolio Management Agreement provides that GAMAG was "generally . . .

required to include in computing [its] income any income earned in [the] Account." (Stip.

of Facts ¶ 17; GAMAG Ex. No. 4 at p. 5.)

Pursuant to the monthly activity account statement issued by LSIII to GAMAG on

October 23, 2006, GAMAG's funds purportedly were invested in "Alternative Financial

Asset Account - III.." (Stip. of Facts ¶ 18; GAMAG Ex. No. 9.)

Lake Shore did not receive customer funds; they were delivered to Sentinel through

The Bank of New York ("BONY"). *United States Commodity Futures Trading Comm'n v.*

-7-

*Lake Shore Asset Mgmt. Ltd.*, No. 07 C 3598, 2007 WL 2659990 (N.D. Ill. Aug. 28, 2007).

(Stip. of Facts ¶ 19.) Field 70 of the SWIFT[1] wiring instructions contains the reference

"LakeShore, Alternative Financial Asset Account, Ltd. Favor Customer:    GAMAG

Black+White Ltd." (*Id.* ¶ 20; GAMAG Ex. No. 6.) The wire transfer from GAMAG was

credited to the SEG III cash account held at BONY, along with monies from other customers

of Sentinel. (Stip. of Facts ¶ 21; Trustee Exs. A & B.)

On October 16, 2006, Sentinel issued a daily account statement for the LSAFA

Operating Account, which reflected the $600,000 wire transfer received from GAMAG.

(Stip. of Facts ¶ 22; Trustee Ex. D; GAMAG Ex. No. 5.) The monthly account statements

from September 2006 through August 2007 issued by Sentinel to LSAFA for the LSAFA

Operating Account reflect that LSAFA transferred money from the LSAFA Operating

Account to other accounts, leaving a zero balance in the LSAFA Operating Account on a

regular basis. (Stip. of Facts ¶ 23; Trustee Ex. E.) In the Lake Shore Proceedings, the

District Court found that the Lake Shore Common Enterprise misappropriated customer

funds. (Stip. of Facts ¶ 24; Trustee Ex. K ¶ 18.)

On February 19, 2008, GAMAG filed a proof of claim in Sentinel's bankruptcy case

in the amount of $646,350. (Stip. of Facts ¶ 25; Trustee Ex. L.) The claim was assigned

number 90 by the Bankruptcy Court Clerk. (*Id.*) On March 7, 2008, the Receiver filed

numerous proofs of claim in Sentinel's bankruptcy case (collectively, the "Lake Shore

Claims"), including a claim related to the LSAFA Operating Account in the amount of

---

[1] SWIFT is the Society for Worldwide Interbank Financial Telecommunication, a data carrier that "transports messages between two financial institutions." SWIFT Company Information, http://www.swift.com/about_swift/company_information/index.page?lang=en.

-8-

$1,101,437.35, which was assigned claim number 106 by the Bankruptcy Court Clerk (the

"Lake Shore Claim"). (Stip. of Facts ¶ 26; Trustee Ex. J.)

In the Lake Shore Proceedings, the District Court ordered that "[t]he funds on deposit

at Sentinel . . . are also [Lake Shore] customer funds. As soon as possible given Sentinel's

bankruptcy case, *any remaining Lake Shore funds* held by Sentinel *shall be transferred to*

*the Receiver for the benefit of Lake Shore clients to be distributed to them through the*

*receivership estate* pursuant to further orders of this court[.]" (Stip. of Facts ¶ 27; Trustee

Ex. K at p. 26.) (emphasis supplied) The Receiver has notified GAMAG that it has a claim

entitled to distribution in the Lake Shore Proceedings for the $600,000 investment it made

pursuant to the Investment Advisory Agreement with LSAFA. (Stip. of Facts ¶ 28; Trustee

Exs. M & O.)

Instead of segregating customer funds, Sentinel's insiders "embarked on a massive

leveraging and commingling scheme, for their own benefit, which treated all assets

controlled by Sentinel as part of a single undifferentiated pool." (Stip. of Facts ¶ 29; *Grede*

*v. Citadel Equity Fund, Ltd. et. al* (08 A 00986), Compl. ¶ 2.)

BONY acted as "custodian of securities on behalf of Sentinel and its customers,

clearing agent for Sentinel's securities transactions, and lender to Sentinel." (Stip. of Facts

¶ 30; *Grede v. The Bank of New York et. al* (08 A 00127), Compl. ¶ 1.) Specifically, the

Trustee has made the following allegation:

> BONY established a fundamentally flawed account structure
> for Sentinel's accounts in violation of its obligations under
> federal law and its duties to Sentinel. The account structure:
> (a) commingled customer assets, which should have been
> strictly segregated, with Sentinel's own assets and the assets

> of other customers; (b) facilitated the misuse of customer assets as security for BONY's loan to Sentinel; and (c) allowed BONY, on a daily basis, to apply the proceeds of virtually every securities transaction involving customer asserts to pay down a portion of Sentinel's debt to BONY.

(Stip. of Facts ¶ 30; *Grede v. The Bank of New York et. al* (08 A 00127), Compl. ¶ 3.) (footnote omitted).

Each of the four Lake Shore Funds (the "Funds") had its own investment objectives and strategies. (Stip. of Facts ¶ 31.) A brief summary of each of the Funds is contained in the Receiver's December 5, 2007 report of activities. (*Id.*; Trustee Ex. R at Ex. 5.) For instance, the "Fund 3 Shareholders" invested in a fund that sought to "maximize returns whilst preserving capital by investing, through its investment in the Lakeshore Alternative Financial Asset Account II Limited . . . , in a portfolio consisting mainly of exchange-traded financial derivatives." (Stip. of Facts ¶ 32; GAMAG Ex. No. 8 at p. 5.) After reviewing and analyzing a great number of documents, the Receiver determined that "these four Funds were hopelessly commingled." (Stip. of Facts ¶ 33; Trustee Ex. R at Ex. 5, pp. 1-2.)


## III. **APPLICABLE STANDARDS**

11 U.S.C. § 502 governs the allowance of claims or interests in a bankruptcy case. Claims filed in a bankruptcy case are prima facie presumed valid under § 502(a) and are prima facie proof of their validity under Federal Rule of Bankruptcy Procedure 3001(f). *Conn. Gen. Life Ins. Co. v. Schaumburg Hotel Owner Ltd. P'ship (In re Schaumburg Hotel Owner Ltd. P'ship)*, 97 B.R. 943, 950 (Bankr. N.D. Ill. 1989). Specifically, Bankruptcy Rule

-10-

3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." FED R. CIV. P. 3001(f); *see also In re Salem*, 465 F.3d 767, 779 (7th Cir. 2006).

Generally, a claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). Section 502(b) sets forth the standards of allowability. To the extent a claim falls within any of the nine paragraphs of § 502(b), the claim is not allowable. One of those paragraphs that requires disallowance of a claim provides that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" 11 U.S.C. § 502(b)(1). In this matter, the objecting Trustee contends that there was no contract between Sentinel and GAMAG, and GAMAG's claim is included in the Receiver's Lake Shore Claims. According to the Trustee, to allow both GAMAG's claim and the Lake Shore Claims would provide a double recovery to GAMAG.

Claim objectors carry the initial burden to produce some evidence to overcome the rebuttable presumption of validity. *In re O'Malley*, 252 B.R. 451, 455-56 (Bankr. N.D. Ill. 1999). The evidence set forth by the objecting party must be of a probative force equal to that of the allegations asserted in the claim. *Surf Walk Condo. Ass'n v. Wildman*, 84 B.R. 511, 515 (N.D. Ill. 1988). "Once the objector has produced some basis for calling into question allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable." *O'Malley*, 252 B.R. at 456. However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim. *In re Nejedlo*, 324 B.R. 697, 699 (Bankr. E.D.

-11-

Wis. 2005); *In re Octagon Roofing*, 156 B.R. 214, 218 (Bankr. N.D. Ill. 1993); *Schaumburg Hotel*, 97 B.R. at 950. As the objecting party, the Trustee carries the initial burden to overcome the rebuttable presumption that GAMAG has a valid claim against Sentinel's estate.

The Court held an evidentiary hearing whereby Carsten Straush, the president of the group of GAMAG companies, and the Trustee testified. The parties submitted post-trial briefs, and thereafter the Court took the matter under advisement.

## IV. DISCUSSION

The Court has reviewed GAMAG's claim and determines that it constitutes prima facie evidence of the validity and amount of the claim. *See In re McCoy*, 355 B.R. 69, 72 (Bankr. N.D. Ill. 2006). Based upon the applicable standards stated *supra*, the Trustee, as objector, has the burden of presenting evidence to rebut the claim's prima facie validity. *See id.* The Trustee has objected to GAMAG's claim on the grounds that GAMAG did not have a contractual relationship with Sentinel, and the Receiver, pursuant to the District Court's orders in the Lake Shore Proceedings, is the proper party to collect from Sentinel because GAMAG was among the customers of LSAFA, and was not a customer of Sentinel.

"Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." *Raleigh v. Ill. Dept. of Revenue,* 530 U.S. 15, 20 (2000). "The validity of claims in bankruptcy, including the quantum of proof needed to establish a claim, is determined under non-bankruptcy law." *Wish Acquisition, LLC v.*

-12-

*Salvino (In re Salvino)*, 373 B.R. 578, 584 (Bankr. N.D. Ill. 2007), *aff'd*, No. 07 C 4756,

2008 WL 182241 (N.D. Ill. Jan. 18, 2008). The basis of GAMAG's claim against Sentinel

is the Investment Advisory Agreement between Sentinel and LSAFA. GAMAG contends

that it has the right to recover the funds that it undisputedly deposited into Sentinel's account

at BONY because it was the intended third-party beneficiary of the Investment Advisory

Agreement. The Investment Advisory Agreement between Sentinel and LSAFA is governed

by Illinois law. (Trustee Ex. F ¶ 9.)

Under Illinois law, a cause of action based on a contract can be brought only by a

party to that contract, by someone in privity with that party, or by an intended third-party

beneficiary of the contract. *Kaplan v. Shure Bros.*, 266 F.3d 598, 602 (7th Cir. 2001); *Stamp

v. Inamed Corp.*, 777 F. Supp. 623, 625 (N.D. Ill. 1991). It is undisputed that GAMAG was

not a party to the Investment Advisory Agreement nor was it in privity of contract with

Sentinel. GAMAG contracted with LSIII and LSAFA pursuant to the Portfolio Management

Agreement. Sentinel was not a party to that contract. Hence, the only avenue of recovery

GAMAG would have under the Investment Advisory Agreement would be as a third-party

beneficiary of that contract.

Under Illinois law, "if a contract is entered into for the direct benefit of a third person,

the third person may sue for a breach of the contract in his or her own name. . . ." *Olson v.

Etheridge*, 686 N.E.2d 563, 566 (Ill. 1997); *Ervin v. Nokia, Inc.*, 812 N.E.2d 534, 540 (Ill.

App. Ct. 2004) (*quoting Olson*); *Horning v. Lab. Corp. of Am.*, No. 09 C 3421, 2009 WL

2905553, at *3 (N.D. Ill. Sept. 3, 2009) (*citing Olson*). There is a strong presumption against

conferring contractual rights on third parties. *Quinn v. McGraw-Hill Cos., Inc.*, 168 F.3d

-13-

331, 334 (7th Cir. 1999); *Estate of Willis v. Kiferbaum Constr. Corp.*, 830 N.E.2d 636, 642

(Ill. App. Ct. 2005). In order to overcome this presumption, "the implication that the

contract applies to third parties must be so strong as to be practically an express declaration."

*Ball Corp. v. Bohlin Bldg. Corp.*, 543 N.E.2d 106, 107 (Ill. App. Ct. 1989). A third party

does not have contractual rights unless a provision of the contract was intentionally included

for the direct benefit of that party. *Linnemann v. Post (In re Mission Bay Ski & Bike, Inc.)*,

398 B.R. 250, 255 (Bankr. N.D. Ill. 2008) *(citing Willis)*.

Courts look to the intent of the contracting parties at the time the contract was entered

into in order to determine whether a third party was an intended beneficiary of the contract.

*Gyncor, Inc. v. Healthshield Capital Corp. (In re Gyncor, Inc.)*, 251 B.R. 344, 353 (Bankr.

N.D. Ill. 2000). Express language in the contract that identifies the third-party beneficiary

is the best evidence of an intent to benefit that party. *Quinn*, 168 F.3d at 334; *Wallace v. Chi.*

*Hous. Auth.*, 298 F. Supp.2d 710, 724 (N.D. Ill. 2003). "A third party is a direct . . .

beneficiary when the contracting parties have manifested in their contract an intention to

confer a benefit upon the third party." *Ball*, 543 N.E.2d at 107. "Liability to a third party

must appear affirmatively in the contract language and the circumstances of the parties at the

time of execution; it cannot be expanded simply because the circumstances justify or demand

further liability." *Willis*, 830 N.E.2d at 643.

GAMAG failed to rebut the presumption that the Investment Advisory Agreement

between Sentinel and LSAFA was not intended to benefit GAMAG. That Agreement neither

explicitly nor implicitly refers to GAMAG, nor does it grant GAMAG any rights to enforce

the Agreement against Sentinel. On its face, the Investment Advisory Agreement only refers

-14-

to Sentinel and LSAFA; it makes no mention of GAMAG. The express language of the

Investment Advisory Agreement does not manifest an intent to benefit GAMAG as principal

with LSAFA acting as its agent. Moreover, there was no evidence adduced at the hearing

to show that either Sentinel or LSAFA intended GAMAG as a beneficiary of the Investment

Advisory Agreement. The Agreement did not grant GAMAG direct access to the money

deposited in the Sentinel custodial account. LSAFA deemed it necessary to provide Sentinel

with an instruction letter, separate from the Investment Advisory Agreement, to dictate the

process, which involved direction from LSAFA to Sentinel, for the withdrawal of funds by

GAMAG. (Trustee Ex. G.) Based on the evidence, the Court finds that the Investment

Advisory Agreement was intended to govern only the relationship between Sentinel and

LSAFA. Thus, the Court finds that GAMAG was not intended as a third-party beneficiary

of the Investment Advisory Agreement between Sentinel and LSAFA.

GAMAG does not have a direct contract claim against Sentinel. There was no privity

of contract between GAMAG and Sentinel. GAMAG entered into the Portfolio Management

Agreement with LSIII and LSAFA. Sentinel was not a party to this contract. In short,

GAMAG had a contract with LSIII and LSAFA, and LSAFA had a contract with Sentinel.

While both of these documents provided that money would be invested in an account

maintained at BONY, GAMAG's rights to recover the money it invested flow through

LSAFA. GAMAG does not have a direct claim against Sentinel under these documents.

This matter is similar to the result in *In re Boone County Utils., LLC*, 506 F.3d 541 (7th Cir.

2007), wherein contract claims that were based on a contract to which the debtor was not a

party were properly disallowed. *Id.* at 544. *See also In re Hall*, 403 B.R. 224 (Bankr. D.

-15-

Conn. 2009) (disallowing claim of bank's successor where there was no actual relationship and no meeting of the minds between the debtor and the bank, and there was no basis for determining that the debtor became obligated to the bank through actions of agent).

The Court finds that based on these contracts, GAMAG has a claim against LSIII and LSAFA, and the Receiver has a claim against Sentinel that includes GAMAG's claim. The Trustee testified that "Lake Shore"[2] was a customer of Sentinel (Trial Tr. p. 47 lines 20-21; p. 57 lines 16-17), and GAMAG was not a customer of Sentinel, but was a customer of Lake Shore (Trial Tr. p. 52 lines 12-13; p. 57 lines 7-9; p. 64 lines 14-15). There was no evidence adduced at the hearing to show that GAMAG was supposed to have a direct customer relationship with Sentinel or that Sentinel accepted a direct customer relationship with GAMAG. The Trustee further testified that Sentinel did not have any records to reflect a liability on its books to GAMAG. (Trial Tr. p. 52 lines 13-14.)

Indeed, the evidence demonstrated that GAMAG contracted with two entities in the Lake Shore Common Enterprise for a separate managed account to be maintained with Sentinel.[3] On October 16, 2006, Sentinel issued a daily account statement for the LSAFA

---

[2] The Lake Shore Common Enterprise operated through a myriad of companies and operated different funds, most using the "Lake Shore" name. Because the exact "Lake Shore" entities are not always relevant to the issue at bar, reference to these entities is often made to "Lake Shore."

[3] At trial, Carsten Straush, the president of the group of GAMAG companies, testified that GAMAG intended to contract with Lake Shore for a separate managed account and did not intend for its monies to be invested in the funds operated by Lake Shore. (Trial Tr. p. 9 lines 10-11 & lines 20-21; p. 29 lines 16-18). Sentinel was never notified by Lake Shore, however, that Sentinel was supposed to separately maintain GAMAG's funds. (Trial Tr. p. 46 line 25-p. 47 line 17; p. 49 line 13-p. 50 line 4.) GAMAG never advised Sentinel, prior to June or July 2007, that Sentinel was supposed to separately maintain GAMAG's
(continued...)

-16-

Operating Account, which reflected the $600,000 wire transfer received from GAMAG. (Trustee Ex. D; GAMAG Ex. No. 5). The $600,000 sum was reported on a customer statement, but not on a statement to GAMAG. The record does not reflect how GAMAG's $600,000 proceeds were used after October 16, 2006. There was no evidence adduced at the hearing to show that the $600,000 remained at Sentinel or can be traced to any Sentinel account. In fact, the Trustee testified that once the $600,000 was transferred into the LSAFA Operating Account, it was commingled with other customers' funds. (Trial Tr. p. 43 lines 16-25; p. 46 lines 10-19.)

In the Lake Shore Proceedings, the District Court found that the Lake Shore Common Enterprise misappropriated customer funds (Stip. of Facts ¶ 24; Trustee Ex. K ¶ 18), and that those funds that were supposed to be invested in separate managed accounts, like GAMAG's funds, were invested in the Lake Shore funds. On October 4, 2007, the District Court appointed the Receiver as a temporary equity receiver, with full powers, for the Lake Shore Common Enterprise, including over its funds and accounts, directly or indirectly owned, beneficially or otherwise, which includes investors' funds. (Trustee Ex. H at pp. 1-2.) The District Court appointed the Receiver to make the claim against Sentinel on behalf of Lake Shore's customers, including GAMAG. The District Court ordered that "[t]he funds on deposit at Sentinel . . . are . . . [Lake Shore] customer funds. As soon as possible given Sentinel's bankruptcy case, any remaining Lake Shore funds held by Sentinel shall be transferred to the Receiver for the benefit of Lake Shore clients to be distributed to them

_____

[3](...continued)
funds. (Trial Tr. p. 25 lines 17-21.)

-17-

through the receivership estate. . . ." (Trustee Ex. K at p. 26.) On March 7, 2008, the

Receiver filed the Lake Shore Claims, which includes the Lake Shore Claim that related to

the LSAFA Operating Account in the amount of $1,101,437.35. (Trustee Ex. J.) The

Receiver notified GAMAG that it has a claim entitled to distribution in the Lake Shore

Proceedings for the $600,000 investment it made pursuant to the Investment Advisory

Agreement with LSAFA. (Stip. of Facts ¶ 28; Trustee Exs. M & O.) The Court finds that

customers of Lake Shore, including GAMAG, should recover their claims through the

Receiver.

GAMAG argues that it is entitled to recover directly from Sentinel under the doctrine

of assumpsit. The action of assumpsit has been described as "an elemental principle of law,

applied in both law and equity courts, that where one person has received money or its

equivalent, which belongs to another, under such circumstances that in equity and good

conscience he ought not to retain it, recovery will be allowed." *Sundance Homes, Inc. v.*

*County of DuPage*, 746 N.E.2d 254, 272 (Ill. 2001) (Freeman, J. concurring) (internal

quotation omitted); *see also Bd. of Highway Comm'rs, Bloomington Twp. v. City of*

*Bloomington*, 97 N.E. 280, 285 (Ill. 1911). Under Illinois law, an action for money had and

received is maintainable where the defendant has received money that in equity and good

conscience belongs to the plaintiff. *Kaiser v. Fleming*, 735 N.E.2d 144, 147 (Ill. App. Ct.

2000).

The Court finds that GAMAG does not have a right to recover from Sentinel based

on an action in assumpsit for money had and received. The evidence adduced at trial does

not demonstrate any circumstances that in equity and good conscience dictate that recovery

-18-

should be allowed to GAMAG. GAMAG sent money to a Sentinel account held at BONY.

Sentinel received that money, but it was for the benefit of LSAFA pursuant to the Investment

Advisory Agreement between LSAFA and Sentinel. It is undisputed that Sentinel

commingled GAMAG's $600,000 with the funds of Sentinel's customers and its own funds.

(Trial Tr. p. 39 lines 11-14.) There was no evidence that the $600,000 remains at Sentinel

or can be traced to any Sentinel account. Hence, the Trustee is not attempting to retain that

money and enrich Sentinel's estate. Indeed, the Trustee testified that he intends to pay the

Lake Shore Claims filed by the Receiver, and has already paid approximately $35 million to

the Receiver. (Trial Tr. p. 54 lines 4-8.)

This matter is analogous to an interpleader situation. Interpleader is an equitable

procedure utilized when a stakeholder is in danger of exposure to double liability or the

vexation of litigating conflicting claims. *Aaron v. Mahl*, 550 F.3d 659, 663 (7th Cir. 2008);

*Indianapolis Colts v. Mayor & City Council of Baltimore*, 741 F.2d 954, 957 (7th Cir. 1984).

The Trustee, on behalf of Sentinel, is the stakeholder of the limited fund from the bankruptcy

estate under the confirmed liquidating plan. Understandably, he is concerned about

defending multiple claims to this fund and paying the claim twice–once to the Receiver on

behalf of Lake Shore's customers and then to GAMAG directly as sought in the claim at bar.

As for equity and good conscience, those concepts dictate that the Court disallow

GAMAG's claim without prejudice to its claim in the Lake Shore Proceedings so as not to

afford GAMAG an advantage over other customers of Lake Shore. Equity favors

disallowance of GAMAG's claim so that GAMAG does not receive more than other Lake

Shore customers similarly situated. The Trustee testified that there were numerous other

-19-

customers of Lake Shore who made deposits into the Lake Shore account. (Trial Tr. p. 57

lines 10-12.) The Court agrees with the Trustee that GAMAG should be treated like every

other customer of Lake Shore. (*Id.* at p. 57 lines 13-15). Moreover, the District Court found

that Lake Shore misappropriated customer funds. (Stip. of Facts ¶ 24; Trustee Ex. K ¶ 18.)

The District Court ordered that the Lake Shore customer funds held by Sentinel are to be

transferred to the Receiver for the benefit of Lake Shore's customers. (Trustee Ex. K at p.

26.) The Receiver is then required in the Lake Shore Proceedings to distribute those funds

to Lake Shore's customers. (*Id.*) Because GAMAG is a customer of Lake Shore, and the

Lake Shore customer funds held by Sentinel are to be transferred to the Receiver for the

benefit of Lake Shore's customers (including GAMAG), equity dictates that GAMAG has

a claim against Lake Shore, which it will recover through the Lake Shore Claims filed by the

Receiver here, not against Sentinel directly.

GAMAG further argues that because it has standing to assert a claim against Sentinel,

its claims should *ipso facto* be allowed. "Every plaintiff in federal court must establish that

it has standing to assert its claims, *i.e.*, that it is entitled to have the court decide the merits

of the dispute. *Gecker v. Marathon Fin. Ins. Co. (In re Auto. Prof'ls, Inc.)*, 389 B.R. 630,

632 (Bankr. N.D. Ill. 2008). In federal court, standing has two aspects: constitutional and

prudential. *Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 223 (Bankr.

N.D. Ill. 2003), *aff'd*, No. 03 C 8023, 2004 WL 2075442 (N.D. Ill. Aug. 31. 2004).

"The constitutional aspect comes from the 'case or controversy' requirement in

Article III. To meet that requirement, a plaintiff seeking relief must have suffered an 'injury

in fact.'" *Id.* The conditions that endow parties with standing to participate in bankruptcy

-20-

proceedings are more limited than those that suffice to establish standing under Article III

of the U.S. Constitution, and parties must be "directly and adversely affected pecuniarily"

by an order of the bankruptcy court in order to have standing. *In re Andreuccetti*, 975 F.2d

413, 416 (7th Cir. 1992) (internal quotation omitted).

       "The 'prudential' aspect, on the other hand, involves standing limits that are

'essentially matters of judicial self-governance' meant to ensure that the courts only resolve

disputes suitable for judicial resolution." *Holstein*, 299 B.R. at 223 (*quoting Warth v. Seldin*,

422 U.S. 490, 500 (1975)).  One such limit mandates that a litigant suing under a statute

"'fall within the zone of interests protected or regulated by the statute or constitutional

guarantee in question.'" *Id.* (*quoting FMC Corp. v. Boesky*, 852 F.2d 981, 988 (7th Cir.

1988) (internal quotation omitted)).  This is often referred to as statutory standing.  *Id.*

Statutory standing requires that "the particular federal statute the plaintiff seeks to invoke

must afford the plaintiff a right to relief." *FMC Corp.*, 852 F.2d at 988.

       The Court finds that GAMAG has unquestioned standing to assert its claim for over

$600,000 against Sentinel's estate.  In fact, the Trustee has not objected to GAMAG's

standing to pursue its claim against Sentinel's estate.  That GAMAG has standing, however,

does not entitle its claim to be allowed.  Standing pertains to whether a litigant "is entitled

to have the court decide the merits of the dispute or of particular issues." *Warth*, 422 U.S.

at 498.  GAMAG fails in its attempt to utilize standing as a basis for the allowance of its

claim.  GAMAG misinterprets the doctrine of standing, which only allows it to pursue its

claim against Sentinel, as a basis for the allowance of its claim.  Standing affords a party the

right to be heard by a court, but does not serve as a cornerstone or guarantee for recovery.

-21-

Additionally, GAMAG argues that LSAFA entered into the Investment Advisory

Agreement with Sentinel as GAMAG's agent, and therefore, GAMAG, as principal, has

standing to recover directly from Sentinel. There was no evidence adduced at the hearing

to show that LSAFA entered into the Investment Advisory Agreement with Sentinel as

GAMAG's agent, or that Sentinel somehow knew LSAFA was merely acting as GAMAG's

agent. LSAFA signed the Agreement as a client of Sentinel and not as an agent of GAMAG.

(Trustee Ex. F at p. 3.) The Court will rely on the documents as drawn and executed. Thus,

the Court rejects GAMAG's argument that LSAFA was GAMAG's agent pursuant to the

Investment Advisory Agreement.

GAMAG also argues that the Receiver does not having standing to file a claim in

Sentinel's case on behalf of GAMAG. The Lake Shore Claim filed by the Receiver is not

at issue here. Rather, the matter before the Court is the Trustee's objection to GAMAG's

claim. The District Court appointed the Receiver, with full powers of an equity receiver, for

the Lake Shore Common Enterprise. (Trustee Ex. H at p. 1.) The Receiver's appointment

includes the appointment over "all funds, properties, premises, accounts, and other assets

directly or indirectly owned, beneficially or otherwise, by [LSAFA], individually or

collectively, including, but not limited to, investors' funds. . . ." (*Id.* at p. 2.) The District

Court has ordered that "[t]he funds on deposit at Sentinel . . . are . . . [Lake Shore] customer

funds. As soon as possible given Sentinel's bankruptcy case, any remaining Lake Shore

funds held by Sentinel shall be transferred to the Receiver for the benefit of the Lake Shore

clients to be distributed to them through the receivership estate. . . ." (Trustee Ex. K at p.

26.) Based on the District Court's orders, this Court finds that the Receiver does have

-22-

standing to assert claims in Sentinel's case on behalf of the Lake Shore customers, including

GAMAG. The Court will not ignore the District Court's orders. Rather, it will give those

orders the full weight to which they are entitled.

GAMAG cites to *B.E.L.T., Inc. v. Lacrad Int'l Corp.*, No. 01 C 4296, 2002 WL

1905389 (N.D. Ill. Aug. 19, 2002), to challenge the Receiver's standing to pursue the Lake

Shore Claims. GAMAG contends that the *B.E.L.T.* case supports its argument that the

Receiver can pursue only claims for the various Lake Shore entities and their shareholders.

The District Court expressly appointed and empowered the Receiver for the Lake Shore

Common Enterprise. (Trustee Ex. H at p. 1.) The powers and duties of the Receiver include

the recovery of all property of the Lake Shore entities, including but not limited to investors'

funds (which includes GAMAG). (*Id.* at pp. 2-4.) The District Court ordered that any

remaining funds at Sentinel "shall be transferred to the Receiver for the benefit of the Lake

Shore clients to be distributed to them through the receivership estate. . . . " (Trustee Ex. K

at p. 26.) Hence, the Receiver has brought the Lake Shore Claims before this bankruptcy

court pursuant to the District Court's orders. Any challenges to the authority of the Receiver

to act in connection with the Lake Shore Claims can be resolved only by the District Court.

That challenge is not proper before this Court.

In sum, the Court finds that the Trustee, as objector to GAMAG's claim, has met his

burden of presenting evidence to rebut the prima facie validity of GAMAG's claim.

GAMAG does not have a separate right to recover from Sentinel based on an action in

assumpsit for money received by Sentinel. The District Court ordered that funds on deposit

at Sentinel are Lake Shore customer funds and should be transferred to the Receiver for the

-23-

benefit of Lake Shore customers to be distributed to them through the receivership estate administered there.  Therefore, GAMAG's claim against Sentinel is, in part, duplicative of and included in the Lake Shore Claim the Receiver filed in this case.  They are both based, in part, on the same $600,000 wired into the Sentinel account at BONY.  In particular, claim number 106, which relates to the LSAFA Operating Account, includes the claim asserted here by GAMAG.  Thus, the Lake Shore Claim filed by the Receiver subsumes GAMAG's claim at bar.  As a result, GAMAG has an allowable claim against the Lake Shore receivership estate, not against Sentinel's bankruptcy estate.  Accordingly, the Trustee's objection to GAMAG's claim is sustained and the claim is disallowed in full without prejudice to GAMAG's claim in the Lake Shore Proceedings.

## V. CONCLUSION

For the foregoing reasons, the Court sustains the Trustee's objection to GAMAG's claim and disallows the claim without prejudice to its claim in the Lake Shore Proceedings.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: _____9/30/9_____

_____
**John H. Squires**
**United States Bankruptcy Judge**

cc:    See attached Service List

**SERVICE LIST**
**In re Sentinel Management Group, Inc.**
**Case No. 07-14987**

Frederick J. Grede
Liquidation Trustee
c/o Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611

Ira Bodenstein, Esq.
Shaw Gussis Fishman Glantz
Wolfson & Towbin LLC
321 N. Clark Street, Suite 800
Chicago, IL 60610

William T. Neary, U.S. Trustee
 Dirksen Federal Courthouse
219 S. Dearborn Street, Room 873
Chicago, IL 60604

Benjamin I. Finestone, Esq.
Quinn Emanuel Urquhart Oliver & Hedges
LLC
51 Madison Avenue, 22nd Floor
New York, NY 10010

Catherine L. Steege, Esq.
Christine L. Childers, Esq.
Jenner & Block LLP
330 N.Wabash Avenue
Chicago, IL 60611

Mark A. Berkoff, Esq.
DLA Piper US LLP
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601

Paul M. Bauch, Esq.
Carolina Y. Sales, Esq.
Bauch & Michaels, LLC
53 W. Jackson Blvd., Suite 1115
Chicago, IL 60604